# NORTHWESTERN LIFE INSURANCE COMPANY *v.* MUSKEGON BANK.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued May 4, 1887. — Decided May 27, 1887.

An application for a policy of life insurance contained these questions and answers: *Q.* "Are you, or have you ever been, in the habit of using alcoholic beverages or other stimulants ?" *A.* "Yes, occasionally." *Q.* "Have you read and assented to the following agreement?" *A.* "Yes." The agreement referred to contained the following: "It is hereby declared that the above are the applicant's own fair and true answers to the foregoing questions, and that the applicant is not, and will not become, habitually intemperate or addicted to the use of opium." The policy declared that if the assured should become intemperate so as to impair his health or induce *delirium tremens,* or if any statement in the application, on the faith of which the policy was made, should be found to be in any material respect untrue, the policy should be void. The assured having died, his creditor for whose benefit the insurance was made sued the insurer to recover on the policy. The defendant set up (1) that at the time of making the policy the insured was and had been habitually intemperate, and that his statements on which the policy had been issued were fraudulent and untrue; (2) That after the policy was issued he became so intemperate as to impair his health and to induce *delirium tremens.* On both these issues the insurer assumed the affirmative, taking the opening and close at the trial. *Held:*

(1) That the opinion of a witness as to the effect upon the assured at the time of the issue of the policy, of a habit of drunkenness five years before that date (the witness knowing nothing of them during the intervening period), was properly excluded.

(2) That under the 1st issue the defendant was bound to prove that the assured was habitually intemperate when the policy issued; and under the 2d, that he was so after it issued.

(3) That while in a very clear case a court may assume on the one hand that certain facts disclose a case of habitual intemperance, or on the other that they warrant the opposite conclusion, in the main these are questions of fact to be submitted to the jury.

(4) That the charge of the court contained all that it was necessary for him to say by way of assisting the jury to arrive at a just verdict, and that he was not required to give them the same instructions over again in language selected by the defendants' counsel.

(5) That other requests made by defendants' counsel took from the jury the decision of the question which should be left to them.

If, in regard to any particular subject or point pertinent to the case the court has laid down the law correctly, and so fully as to cover all that is proper to be said on the subject, it is not bound to repeat this instruction in terms varied to suit the wishes of either party.

THIS was an action at law upon a policy of insurance. Judgment for the plaintiff. The defendant sued out this writ of error. The case is stated in the opinion of the court.

*Mr. Edward Salomon* for plaintiff in error.

*Mr. John E. Parsons* for defendant in error. *Mr. John P. Adams* was with him on the brief.

MR. JUSTICE MILLER delivered the opinion of the court.

The Muskegon National Bank recovered a judgment, in the Circuit Court of the United States for the Southern District of New York, against the Northwestern Mutual Life Insurance Company, upon a policy of insurance on the life of Erwin G. Comstock for $23,717.04, and to this judgment the present writ of error is directed.

The bank had an insurance upon the life of Comstock, its debtor, for the sum of $20,000. On the trial before the jury, although some other issues were made in the pleadings, the contest turned, so far as the assignments of error are presented here, on the condition of Comstock in regard to the habit of drinking alcoholic liquors. The policy and the application for it, the answers to which were signed both by Com-

stock and the bank through its president, present the foundation of the controversy. The sixteenth interrogatory is as follows: " Are you, or have you ever been, in the habit of using alcoholic beverages or other stimulants ? " The answer to this was, " Yes, occasionally." The twenty-second interrogatory, " Have you read and assented to the following agreement ? " was answered, " Yes." This agreement, so far as it touches the present issue, reads as follows: " It is hereby declared that the above are the applicant's own fair and true answers to the foregoing questions, and that the applicant is not, and will not become, habitually intemperate or addicted to the use of opium." The body of the policy declared that if Comstock shall become intemperate, so as to impair his health or induce *delirium tremens*, or if any statement in the application, on the faith of which the policy is made, shall be found to be in any material respect untrue, the policy is void.

Upon this language in the application and the policy, the defendant founded two separate pleas or defences :

First. That "at the time of making and presenting said application as aforesaid, and of the issuing of said policy, the said Erwin G. Comstock was and prior thereto had been habitually intemperate, and that the said statement in said application contained that said Erwin G. Comstock was not then habitually intemperate, was untrue and fraudulently made, and a suppression of facts material to the risk assumed by said policy of insurance."

Second. That "said policy was issued by this defendant and accepted by said plaintiff upon the express condition, amongst others contained therein, that if said Erwin G. Comstock should become either habitually intemperate or so far intemperate as to impair health or induce *delirium tremens*, the said policy should be null and void ; that in fact, as this defendant is informed and believes, the said Erwin G. Comstock did, after the issuing of said policy, become habitually intemperate, and so far intemperate as to impair his health and induce *delirium tremens*, and that thereby the said policy became and is null and void."

The issues were tried upon the two allegations of habitual

intemperance before 'and after the issue of the policy. The company, discarding other issues, assumed the affirmative on these two pleas, and on a plea of suicide, which seems to have been abandoned, and thereby obtained the opening and the conclusion to the jury. The assignments of error raise objections to the action of the court in excluding answers to questions propounded to witnesses for the defendant company on the trial, as well as its refusal to give certain instructions prayed for by the defendant to the jury.

A witness for the defendant, named Torrent, testified that he knew Comstock at Muskegon from 1868 to 1875. The policy of insurance was taken out in New York in 1879. The witness further stated that he was well acquainted with Comstock in Muskegon, and knew that he was addicted to the use of intoxicating liquors during the period of their acquaintance; had seen him drunk; knew of his being on prolonged sprees, and gave other testimony to the effect that he did use intoxicating liquors to excess. He was then asked this question.: "Up to the time your acquaintance with him ceased, what would you say as to whether his drinking had affected his health or impaired his vital powers in any respect?" To this he answered: "I think it had affected him materially; I think it had affected his nerves and impaired his health generally, general debility; the symptoms of that were his general looks, and that the time he went away, or just before, he was taken very sick, and they didn't know whether he was going to be alive or die; that was the general impression." The court excluded this answer, and the defendant excepted. The witness also testified that he saw him during that sickness, and that he was then sick for about three weeks, adding: "I think he had the *delirium tremens.*" This expression of opinion was also excluded.

It is to be observed that the witness had testified to all the facts which he knew, without objection, that tended to establish a habit of intemperance in Comstock prior to 1875. What he was next asked, and what he then testified to, was his opinion in regard to the effect of this intemperance upon the health of the assured. It will be noted that all this occurred

between four and five years before the execution of the policy. We are of opinion that while the facts recited by this witness and received in evidence might have some remote tendency to show Comstock's habits in regard to temperance at the time to which they related, his opinion of their effect upon his health at the date of the policy, four years later, was inadmissible as to that or his habits, as he knew nothing of these during that period.

The exception to the testimony of Barney, who undertook to detail conversations with a doctor attending Comstock prior to 1875, as to whether Comstock was threatened with *delirium tremens* or not, and the statement of the witness that *he* was afraid Comstock was going to have *delirium tremens*, which was excluded by the court, depend upon the same principle and are otherwise incompetent. We see no error in those rulings.

The remaining assignments of error have regard to prayers for instructions by the court to the jury, which were refused. No assignment of error is founded on any exception taken to the charge of the judge who tried the case, which seems to have been eminently fair and very full, and in our op⋅⋅ embraced all that was necessary to be said to the jury on the subject. The questions which the jury had to respond to were whether Comstock was of intemperate habits at the time the policy was taken out, and whether he became habitually intemperate after that period. The whole case turned, so far as the jury was concerned, upon the true definitions of the words "habitually intemperate," taken in connection with the testimony on the subject, at these two different periods. The plaintiff was not bound to prove that the assured was temperate, or that he was a temperate man, but the defendant was bound to prove not only that Comstock was intemperate at those periods, but that he was habitually so. This it was bound to do by such a preponderance of testimony as should satisfy the jury that at one of these periods or the other he was habitually intemperate. We do not know of any established legal definition of those words. As they relate to the customs and habits of men generally in regard to the use of

intoxicating drinks, and as the observation and experience of one man on that subject is as good as another of equal capacity and opportunities, their true meaning and signification would seem to be a question addressed rather to the jury than to the court. While there may be on the one hand such a clear case of intemperate habits as to justify the court in saying that such and such facts constitute a condition of habitual intemperance, or on the other such an entire absence of any proof, beyond an occasional indulgence in the use of ardent spirits, as to warrant the opposite conclusion, yet the main field of inquiry, and the determination of the question within it, must be submitted to the jury, and the question on this submission must be decided by them.

The testimony in this case is all embodied in the record, and is contradictory. It must be divided into its relations to the two periods, before and after the execution of the policy. It is seen from the testimony that Comstock left Muskegon, where many of these witnesses resided who testify as to his excessive use of intoxicating drinks, prior to 1875, and that they know nothing of his habits after that. The policy was taken out in 1879. It is also quite clear, that, under a pledge made to one of his partners in business, he had refrained from the use of intoxicating drinks from the first of June, 1878, up to the time of taking out this policy, and continued so to refrain up to March, 1880. There are several witnesses who testify that after his removal to New York in 1875 he was drunk, had sprees once in a while, and perhaps several of them up to the time when he made this pledge to his partner. There are others who testify that after March, 1880, he was again seen intoxicated and had spells of confinement on account of those sprees. On the other hand there were four or five witnesses examined, some of whom were in the same building in which Comstock was employed in New York, who saw him daily, and transacted business with him for the two or three years prior to his death, which was in 1881, who testify that they never saw him drunk, or under the influence of liquor, and did not suppose that he was addicted to drinking, but that he was a prompt, efficient business man, and that they had no suspi-

cion that he was intemperate or indulged in the excessive use of stimulants. Among these, Mr. Samuel Borrow, vice-president of the Equitable Life Assurance Society, in whose building Comstock was a tenant, says that he saw him almost daily for two or three years prior to his death, that he struck him as a very energetic, active man, and that he never saw him under such circumstances as to suggest that he had been drinking.

Under these circumstances, and in view of this conflicting testimony, the following language of the judge in his charge to the jury in this case seems to contain all that was necessary for him to say by way of assisting them to arrive at a just verdict:

"I think that there is no rule of law which says that, in order to make a man a drunkard, he must drink every day or every week to excess. Neither, on the other hand, does a single or an occasional excess make a man an habitual drunkard; but, if you find that the habit and rule of a man's life is to indulge periodically and with frequency, and with increasing frequency and violence, in excessive fits of intemperance, such a use of liquor may properly cause the finding of habitual drunkenness. It is the fact of the certainty of these periodical sprees, accompanied with their frequency, which marks the habit. If a man should indulge in such a debauch once in a year only, it could not, in my opinion, properly be said that he was an habitual drunkard; he would be an occasional drunkard. But if such debauches increase in frequency, and the certainty of their increasing frequency becomes established, then the time finally arrives when the line between an occasional excess and habit is crossed. It is for you to say whether Comstock was at the time of the application, or became afterwards, the victim of such a habit."

"If you find that, after the making of the policy, Comstock became so far intemperate as to impair his health, the policy is avoided, and the verdict will be for the defendant."

At the request of the defendant, he also gave to the jury the following instructions:

"If the jury find from the evidence that Erwin G. Com-

stock was habitually intemperate when the application for the
policy of insurance was made, then they must find for the de-
fendant.

"If the jury find from the evidence that Erwin G. Com-
stock became habitually intemperate after the issuing of the
policy, then they must find for the defendant.

"If the jury find from the evidence that, after the making
of the policy, Erwin G. Comstock became so far intemperate
as to impair his health, then they must find for the defend-
ant."

Exceptions were taken and errors assigned in regard to the
following instructions, which were asked and refused by the
court:

First. "To be habitually intemperate it is not necessary
that a person should be addicted to the excessive use of in-
toxicating liquors continually, or without interruption; but a
person who, during a period of time sufficient to form a habit
in that respect, is addicted to periodical 'sprees' of longer or
shorter duration, when for days in succession he drinks intoxi-
cating liquors to great excess, producing a state of continued
drunkenness until prostration and sickness compel a cessation,
and terminate the 'spree,' comes within the definition of being
habitually intemperate, although such person may remain
sober for a month, three or six months, or even a year at a
time."

Second. "If the jury find from the evidence that for seven
or eight years immediately prior to the 17th day of April
1879, Erwin G. Comstock was addicted to periodical 'sprees,'
when for several days and sometimes for a week or more in
succession he would drink intoxicating liquors to great excess,
producing a state of continued drunkenness until prostration,
and sickness intervened, then they must find for the defendant,
although they may find that he would remain sober for a
month, three or six months, or even a year at a time."

Third. "It was the duty of the plaintiff and of Erwin G.
Comstock in their application for this policy of insurance to
communicate to the defendant the fact that, for six or seven
years immediately prior to the first day of June, 1878, Com-

stock had been addicted to periodical sprees lasting for a longer or shorter period, when for days in succession he would drink intoxicating liquors to great excess, producing continued drunkenness, although he might remain sober for a month, three or six months, or longer, even, at a time; and their failure to disclose such facts to the defendant avoids the policy, and the jury must find for the defendant."

Fourth. This includes two charges which amount to very much the same thing. They are in the following words:

"If the jury should find from the evidence that for six or seven years immediately prior to the first day of June, 1878, Erwin G. Comstock had been addicted to periodical sprees, lasting for a longer or shorter period, when for days in succession he would drink intoxicating liquors to great excess, producing continued drunkenness, until sickness and prostration would intervene and terminate the spree; that such sprees would occur once in every three or six months or thereabouts; that on the first day of June, 1878, after the termination of one of such sprees, under threat of dissolution of partnership from his then partner, Mr. Hoagland, he gave a written pledge not to drink any more so long as he and Hoagland were associated in business; that his partnership with Hoagland ceased on the first day of May, 1879; that afterwards, during the years 1880 and 1881, he again became addicted to such periodical sprees; that during the year 1880 he had at least three such sprees; that during the year 1881, up to the latter part of April of that year, he had a number of such sprees of great intensity; that in one of those sprees, in or about the month of April, 1881, he subjected himself to the restraint of a nurse for several weeks in order to prevent himself from obtaining liquor; then the jury must find for the defendant.

"If the jury find from the evidence that after the making of the policy of insurance, during the years 1880 and 1881, Erwin G. Comstock became addicted to periodical sprees lasting for a number of days, or even a week or more, each time, when he would use intoxicating liquors to such excess as to produce continued drunkenness, and prostrate him and make him sick for several days; that such sprees occurred in or

about the month of March, 1880, in or about the month of July, 1880, again in or about the month of August, 1880, again on or about the first of January, 1881, again in or about the month of February, 1881, and again in or about the month of April, 1881; that his last sprees in February and April, 1881, were of such intensity that towards the close of the drinking period, when sick and prostrated, he subjected himself to nurses for a week and more each time, in order that they might assist him to become sober; then they must find for the defendant."

The first, second, and third of these prayers for instruction do not differ much from the substance of the charge of the court at its own instance. The language of that charge embodies the real principles upon which these three prayers are based, and in terms much more apt and just to both parties than that used by counsel. The court said, among other things: "Neither does a single or an occasional excess make a man an habitual drunkard; but, if you find that the habit and rule of a man's life is to indulge periodically and with frequency and with increasing frequency and violence in excessive fits of intemperance, such a use of liquor may properly cause the finding of habitual drunkenness." This is the substance, and in very strong language, of the three prayers above referred to for instruction which were refused by the court.

It has been often said by this court, and we repeat it now with emphasis, that if in regard to any particular subject or point pertinent to the case the court has laid down the law correctly and so fully as to cover all that is proper to be said on the subject, it is not bound to repeat this instruction in terms varied to suit the wishes of either party. *Kelly* v. *Jackson*, 6 Pet. 622; *Laber* v. *Cooper*, 7 Wall. 565; *Indianapolis & St. Louis Railroad* v. *Horst*, 93 U. S. 291; *Railway Co.* v. *McCarthy*, 96 U. S. 258. If the charge of the judge, made at his own suggestion, covers the point in question, it is much more likely to be impartial and correctly stated than it will be by counsel.

These requests, however, are inadmissible, as we think, for

other reasons. They all, as near as they dare, attempt to define approximately for the jury the number of times a man must get drunk, or have a spree, or how closely such excesses must succeed each other, to constitute "habitual intemperance." They also attempt to say how long a time a man must have abstained from drunkenness or sprees in order to relieve him from that charge. And especially are the requests obnoxious in saying that, under such circumstances, a person comes within the definition of being habitually intemperate, although he might remain sober for a month, three or six months, or longer, at a time; one of them says, "or even a year at a time." What effect should be given to an entire abstinence from the use of liquors for a whole year, in connection with occasional drunken sprees, before or after, is not for the court to determine. But if it were, it does not seem to us, in view of this testimony, that sufficient force was given to it in the rejected prayers. This reference to periods of abstinence from drink is still more objectionable when it is seen, from the testimony, that during a continuous period, just before and after the taking out of this policy, Comstock was admitted to have been entirely sober, if not entirely abstinent from the use of ardent spirits, for a period of nearly two years. It would be rather harsh for a court to instruct a jury, as a matter of law, that a man who was sober nearly two years was at a period near the middle of that time "habitually intemperate." It was certainly a question to be left to the jury, on all the testimony, to draw their own conclusions in regard to the subject.

The two other requests are still more liable to these objections, inasmuch as they constitute an attempt to recite the various occasions on which the jury might infer that Comstock had been drunk, together with some vague description of the intervals between certain sprees, with an account of his struggles against his thirst for liquor; in fact they are a history of his life for six or seven years prior to the making of the contract for insurance down to the time of his death; from all of which there is sought to be deduced a positive instruction to the jury that they must find for the defendant. We do not think

there was anything in the case which would have justified the court in thus taking the determination of it from the jury. The court had no right in this summing up to ignore the testimony of four or five respectable and intelligent gentlemen who knew Comstock well during the most important part of this period, during several years of it, who saw him almost daily, and who testify that they never had any reason to suppose that he used ardent spirits at all, much less to excess. It was for the jury to weigh all these circumstances, and to determine, in view of them all, whether he was habitually intemperate.

There are very few decisions by courts of high character relating to this question. The principal one which has been brought to our attention is *Insurance Co.* v. *Foley*, 105 U. S. 350, 354. In that case the insured, in answer to the question, "Is the party of temperate habits? has he always been so?" answered, "Yes," whereas the defendant company alleged that in fact he was a man of intemperate habits. The court, through Mr. Justice Field, said:

"The question was as to the habits of the insured. His occasional use of intoxicating liquors did not render him a man of intemperate habits, nor would an occasional case of excess justify the application of this character to him. An attack of *delirium tremens* may sometimes follow a single excessive indulgence. . . . When we speak of the habits of a person we refer to his customary conduct, to pursue which he has acquired a tendency from frequent repetition of the same acts. It would be incorrect to say that a man has a habit of anything from a single act. . . . The court did not, therefore, err in instructing the jury that, if the habits of the insured, 'in the usual, ordinary, and every-day routine of his life were temperate,' the representations made are not untrue, within the meaning of the policy, although he may have an attack of *delirium tremens* from an exceptional over-indulgence. It could not have been contemplated, from the language used in the policy, that it should become void for an occasional excess by the insured, but only when such excess had by frequent repetitions become a habit. And the testi-

mony of witnesses, who had been intimate with him for years, and knew his general habits, may well have satisfied the jury that, whatever excesses he may at times have committed, he was not habitually intemperate."

We think this language eminently applicable to the case before us.

The questions presented by these requests do not rise to the dignity even of mixed law and fact, but are questions the answers to which are governed by no settled principle or rule of law, established either by statute or by a recognized course of judicial decision. They are emphatically questions of fact, which it is the province of a jury to decide, and in regard to which they are or ought to be as capable of making a decision as the court or anybody else.

*The judgment of the Circuit Court is, therefore, affirmed.*