# Richmond

## METROPOLITAN LIFE INSURANCE COMPANY V. GEORGIE R. JOHNSON.

April 10, 1939.

Record No. 2032.

Present, All the Justices.

508

The opinion states the case.

*Morison, Morison & Heuser,* for the plaintiff in error.

*Bandy & Bandy,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

On February 19, 1937, the Metropolitan Life Insurance Company issued a policy of insurance on the life of Horton F. Whited, in which Georgie R. Johnson, the sister of the insured, was named as beneficiary. On October 15, 1937, the insured was found dead in his room at Richmond, Virginia. The city coroner at first certified that Whited had died of "acute alcoholism," but after an autopsy had been

performed the cause of death was changed to "morphine poisoning, suicidal or accidental."

The Insurance Company refused to pay the amount of the policy and suit was instituted on the contract. Two defenses were set up: (1) That the insured had committed suicide within one year of the date of the issuance of the policy; and (2) that he had made material misrepresentations by falsely answering certain questions which were propounded in the application for the policy.

There was a verdict in favor of the plaintiff on which the trial court entered a final judgment. To review that judgment this writ has been awarded.

■ Because the evidence as to suicide was circumstantial and conflicting, the Insurance Company concedes that the verdict of the jury has settled this issue adversely to it. We are, therefore, no longer concerned with that defense.

Our principal concern is whether the evidence conclusively shows that the insured made material misrepresentations in answering the following questions propounded in the application:

"Q. To what extent do you use beer, wine, or other alcoholic beverages? A. None.

"Q. Have you ever used any of them to excess? If so, when and for how long? A. No."

The Insurance Company contends that the evidence shows as a matter of law that the answers to the above questions were false; that the information sought to be elicited by said inquiries was material to the risk assumed; and that, therefore, there should be no recovery on the policy.

At the time the policy was issued, in February, 1937, the insured was thirty years of age and held a responsible position as a pharmacist in a drugstore in the city of Richmond.

The record conclusively shows, we think, that from July 4, 1937, until the date of his death on the following October 15th, the insured had several times become intoxicated and was in this condition on the evening preceding his death.

But it is equally clear from the evidence that from July, 1936, when the insured suffered a severe illness from spinal

meningitis, until July, 1937, he drank no intoxicating liquor of any kind. It thus appears that at the time the application was signed he was not using alcoholic beverages at all.

The evidence is conflicting as to what extent the insured had used alcoholic beverages prior to July, 1936.

Charles O. Fore, who was rooming with Whited at the time of his death, and who had known him intimately for the past four years, testified that the insured began drinking to excess in July, 1937. Before that time this witness had seen the insured intoxicated on only one or two occasions, some five or six months apart. His testimony does not indicate whether these occurrences were before or after the date of the issuance of the policy.

Wilkerson, who lived at the same boarding house with the insured and who had known him for ten years, testified that he saw no evidences of his drinking until the summer of 1937.

Rose, a former employer of the insured, who had known him for the last ten years prior to his death, testified that the latter had drunk both wine and whiskey and had become intoxicated prior to 1936. He did not attempt to fix the dates of these occurrences. While this witness further testified that he thought that Whited's use of alcohol had contributed to his death, he did not know just how long he had been drinking to excess.

The strongest evidence in support of the Insurance Company's position comes from Johnson, Whited's employer. He testified that he had known the insured for eighteen years, and had employed him off and on during the ten years preceding his death. He spoke in the highest terms of Whited's competency and efficiency in his work.

He further testified that "occasionally" Whited would go out with friends and would become intoxicated, sometimes after taking only one drink; that there were periods during which Whited would be drinking for three or four days at a time; and that these occasions were from five to twelve months apart. Except for these occasional digressions, Whited would drink nothing. This witness also testified

that in March, 1936, he had discharged Whited on account of his drinking, but had re-employed him in November of the same year, and that from the latter date until July, 1937, Whited had not drunk at all. In his opinion Whited was not a "drunkard."

The principles governing a proper decision of the question here involved are well settled.

■ "It is generally held that statements made by an applicant for insurance in answer to questions as to his habits in the use of intoxicating liquor are material to the risk." 26 A. L. R. 1280, note citing numerous cases.

Moreover, in the present case the underwriter of the Insurance Company, who approved this particular risk, testified that the use of alcoholic beverages and the extent of such use were material to the risk here assumed, and that the Insurance Company in fact relied on the truthfulness of the answers to these questions in this instance.

■ "Statements as to sobriety, temperate habits, use of intoxicating liquors, etc., usually relate to the time the insurance was issued, and for a reasonable period prior thereto, and not to the insured's whole past life, * * * ." 4 Couch, Cyc. of Insurance Law, section 884-c, p. 2912. See also, 4 Cooley's Briefs on Insurance (2d Ed.), p. 3206.

■ "The question propounded to applicants for life insurance as to the use of spirituous liquors must be construed as referring to customary and habitual use, and not to the occasional use or to an occasional use to excess." 4 Cooley's Briefs on Insurance (2d Ed.), p. 3208. See also, 26 A. L. R., p. 1284, note collecting numerous cases; 37 C. J., pp. 453-454.

■■ In *Grand Lodge* v. *Velcham*, 145 Ill. 308, 33 N. E. 886, 887, it is said: " * * * The language embodied in the application must receive a reasonable construction,—one within the contemplation of the parties at the time the contract of insurance was consummated. What was the purpose of requiring the insured to state in the application to what extent he used alcoholic stimulants, tobacco, and opium? But one object can be perceived, and that was to

guard against the risk which might arise from insuring the life of one who was in the habit of using the articles, or either of them, to such an extent as to imperil the health and life of the individual. If a man drank a glass of liquor, or smoked a pipe of opium or a cigar, once a month, it is too plain to admit of argument that such a use could not endanger the life of the person, and that such a use was not within the contemplation of the parties when the contract of insurance was entered into by the parties. It may be that the language of the question and answer in regard to the use of alcoholic stimulants, if given a strict and technical construction, might be interpreted that the insured did not use alcoholic liquors at all. But in our opinion an insurance company propounding a question of that character should not be allowed to indulge in a strict and technical construction, but, on the other hand, the language should receive a fair and reasonable construction,—a construction which would imply more than an occasional use. There should be, to some extent at least, a habit or custom."

See also, *Supreme Lodge* v. *Foster*, 26 Ind. App. 333, 59 N. E. 877, 880; 4 Cooley's Briefs on Insurance (2d Ed.), pp. 3208-3209.

In *Provident Savings Life Assur. Soc.* v. *Exchange Bank* (C. C. A. 5), 126 F. 360, it was said that the question "Have you ever used liquors to excess?" is not to be construed as referring to any single or occasional act. The word "used" implies more than that. The question is equivalent to one asking whether the applicant had the habit of drinking to excess, and a negative answer does not constitute a misrepresentation merely because it is shown that the insured had sometimes, but not habitually, drunk to excess. To the same effect, see *Penn Mutual Life Ins. Co.* v. *Nunnery*, 176 Miss. 197, 167 So. 416, 418.

In *O'Connor* v. *Modern Woodmen*, 110 Minn. 18, 124 N. W. 454, 25 L. R. A. (N. S.) 1244, it was held that the expression "intemperate use of intoxicating liquors" in a contract of insurance means such indulgence as tends to

impair the health of the insured or renders the risk more hazardous.

In *Northwestern Mutual Life Ins. Co.* v. *Muskegon National Bank*, 122 U. S. 501, 505, 506, 7 S. Ct. 1221, 1223, 30 L. Ed. 1100, where the question involved was whether the insured was habitually intemperate or drank to excess, it was said: " * * * We do not know of any established legal definition of those words. As they relate to the customs and habits of men generally in regard to the use of intoxicating drinks, and as the observation and experience of one man on that subject is as good as another of equal capacity and opportunities, their true meaning and signification would seem to be a question addressed rather to the jury than to the court. While there may be on the one hand such a clear case of intemperate habits as to justify the court in saying that such and such facts constitute a condition of habitual intemperance, or on the other such an entire absence of any proof, beyond an occasional indulgence in the use of ardent spirits, as to warrant the opposite conclusion, yet the main field of inquiry, and the determination of the question within it, must be submitted to the jury, and the question on this submission must be decided by them."

In *McEwen* v. *New York Life Ins. Co.*, 42 Cal. App. 133, 183 P. 373, 377, it was said: " * * * No court, so far as we are advised, has undertaken to define what constitutes the excessive use of alcoholic spirits. * * * The meaning of the word 'excess,' as here used, is largely a matter of opinion, depending upon the capacity of the individual and liberality of view entertained upon the subject by the individual, whose opinion might again be governed by the time, place and occasion. (Citing cases.) In the absence of any standard of measurement, the question is one of fact to be determined by the jurors, whose conclusion, as stated, would depend largely upon their views as to what constitutes excess in the use thereof."

For other authorities holding it to be a question for the jury whether the insured had drunk liquor "to ex-

cess," see 4 Couch, Cyc. of Insurance Law, p. 2219; *Hope* v. *The Maccabees*, 91 N. J. L. 148, 102 A. 689, 1 A. L. R. 455; *Penn Mutual Life Ins. Co.* v. *Nunnery, supra.*

▮ The defense of misrepresentation is an affirmative one, and the burden was on the Insurance Company to prove it by a preponderance of the evidence. *Sands* v. *Bankers' Fire Ins. Co.*, 168 Va. 645, 653, 192 S. E. 617, and authorities there cited.

▮ When these principles are applied to all of the evidence in the record as to the insured's use of alcoholic beverages, we can not say as a matter of law that the jury should have found that the Insurance Company had proved by a preponderance of the evidence that the insured had falsely answered the questions propounded in the application.

As we have already seen, the evidence conclusively shows that at the time the application was signed the insured was not using intoxicating beverages at all, and had not used any for nearly a year. Certainly, then, the jury was warranted in finding that the insured's statement as to his use of intoxicants at the time the policy was issued, and for a reasonable period prior thereto, was not false.

While the matter is not free from doubt, under all of the evidence here related we think the jury was warranted in finding that the Insurance Company had not borne the burden of proof that before the application was signed the insured had formed the habit of drinking to excess, that is, to an extent to materially impair or endanger his health or to shorten his natural expectancy of life.

▮ From the testimony of Johnson, viewed most favorably to the Insurance Company, the jury might, perhaps, have found that the insured had been an excessive user of intoxicating liquors. But this testimony is in conflict with that of three of the insured's intimate associates, each of whom was in as good a position as Johnson to have known of the insured's habits. The jury's verdict has, of course, settled this conflict in favor of the plaintiff. We can not say as a matter of law that this verdict was wrong.

The Insurance Company next contends that it is not liable on the policy because the application contained the question, "Have you ever been told that you had any heart trouble?", to which the insured replied, "No." It is asserted that this answer was false and constituted a misrepresentation which avoided the policy.

The position of the Insurance Company is predicated entirely on the testimony of two witnesses, Rose and Johnson.

In response to a question as to the condition of Whited's health since his attack of meningitis, Rose replied: "All I know is what he told me Dr. Caravati said. The doctor had examined him before he went to the hospital and he told him that his heart was bad."

Johnson testified that, "He (Whited) had always been cautioned by doctors to be careful about his drinking on account of his heart. Q. Do you recall what doctors? A. Dr. Caravati, Dr. Elam Toombs. Dr. Toombs treated him while he had spinal meningitis and he had told me himself he told him to be very careful."

This is all the testimony on the subject and is so vague and indefinite as to have little if any probative value. Neither Dr. Caravati nor Dr. Toombs was called to testify.

It will be observed that neither Rose nor Johnson fixes the dates of their respective conversations with Whited, whether before or after the policy was written.

It is generally held that in a suit by a beneficiary, declarations made by the insured after the issuance of the policy are inadmissible to contradict the statements in the application. *Valley Mutual Life Ass'n* v. *Teewalt,* 79 Va. 421; *Life Insurance Co.* v. *Hairston,* 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989; 86 A. L. R. 152, note.

Moreover, we are left entirely in the dark as to when Dr. Caravati imparted to Whited the information that his (Whited's) heart was bad, or when the doctors had cautioned him "to be careful about his drinking on account of his heart." We are not told whether this was before or after the policy was written. Obviously if Whited did not obtain this information from his doctors until after the

policy had been written, his answer to the question was true and made in good faith.

Misrepresentation is a species of fraud. It is not presumed but must be clearly proved. Doubtless the jury thought that this testimony fell far short of proving that the insured had misrepresented the condition of his health to the Insurance Company.

Upon a careful examination of the record our conclusion is that the jury was fully and fairly instructed on the issues involved and that the judgment is plainly right. Accordingly it is

*Affirmed.*