## WHITE et al. v. HARRIGAN et al.

No. 9427—Opinion Filed Nov. 25, 1919.

Rehearing Denied Feb. 10, 1920.

(Syllabus by the Court.)

### 1. Fraud—Misrepresentation as to Law.

Generally speaking a misrepresentation of law affords no grounds of redress or relief on the theory that all men are supposed to know the law. It is not universally true, however, that a misrepresentation of the law is not binding upon the party who made it. Where one has superior means of information, professes a knowledge of the law and thereby obtains an unconscious advantage of another who is ignorant and has not been in a situation to become informed, the injured party is entitled to relief as well as if the representation had been made concerning a matter of fact.

### 2. Same—Sufficiency of Evidence.

The record examined and held that the representations made constituted fraud.

Error from District Court, Carter County; W. F. Freeman, Judge.

Action by E. A. Harrigan et al. against S. O. White et al. Judgment for plaintiffs, and defendants bring error. Affirmed.

Potterf & Gray, for plaintiffs in error.

H. A. Ledbetter and F. N. Adams, for defendants in error.

HIGGINS, J. In this opinion E. A. Harrigan et al. will be referred to as plaintiffs, and S. O. White et al. as defendants; they so appearing in the trial court.

This is a suit by the plaintiffs to cancel a deed, alleged to have been secured from them by fraud, and certain other deeds and instruments of writing for the reason the same were a cloud on the title to the lands involved in this suit. The judgment of the trial court was in their favor, from which judgment an appeal to review the same has been taken to this court.

A deraignment of title of the parties to this suit is as follows: Ed Punneo in 1911 at a sale of the unallotted lands of the Choctaw and Chickasaw Nation purchased the lands in question and in 1916 received a patent therefor. On November 20, 1912, Ed Punneo by warranty deed conveyed the land

to W. H. McCown, and on December 7, 1915, McCown conveyed the same by warranty deed to E. A. Harrigan, one of the plaintiffs in this suit.

On December 2, 1911, Ed Punneo executed to his brother, Charley Punneo, an instrument in writing as follows.

"Know All Men by These Presents:

"That I, Ed Punneo of Fox in Carter county and the state of Oklahoma, party of the first part. Party in the consideration of the sum of Five Hundred and Seventy Dollars to me paid by Chas. Punneo of Fox, party of the second part, the receipt whereof is hereby acknowledged have bargained, sold, conveyed and transferred, and by these presents do bargain, sell, grant, convey, transfer and deliver unto the said parties of second part, his executors, administrators and assigns the following described property:

"One bay horse mule branded 'P' on left shoulder & 'X' on left thigh, 'C' on left jaw.

"One gray mule branded 'C' on left jaw and bay mare, wire cut on left leg.

"One gray mare brand unknown.

"One buggy Rockiler, farming tools, one lister cultivator.

"One planter, one set of buggy harness, 1,500 feet of lumber, receipt against 80 acres of land described as follows:

"NE2 of NE¼ of Section 20, T2 S, 3W.

"To have and to hold the same unto the said party of the second part, his executors, administrators, and assigns forever and I do warrant my title to said property and do covenant and agree to and with said party of the second part to defend the said described property hereby sold unto the said party of the second part, his executors, administrators and assigns against all and every person whomsoever.

"In Witness whereof I have hereunto set my hand this the 2d day of December, 1911.
                 "Ed PUNNEO.
"Witness: M. Z. Cofey, J. W. Morris."

Indorsed as follows: "Bill of Sale, 1916, Ed Punneo to Chas. Punneo. Filed Jan. 31, 1912 at 8:30 o'clock a. m. S. S. Tolson. Register of Deeds, Carter County, Oklahoma."

As this instrument is endorsed a "Bill of Sale" we will hereafter refer to it as such.

On June 6, 1916, Charley Punneo by warranty deed, conveyed the land to S. O. White, one of the defendants, and Hannah Punneo, his mother. On August 25, 1916, E. A. Harrigan and his wife, Nora Harrigan, by quitclaim deed conveyed the land to S. O. White, and on the same day Hannah Punneo by quitclaim deed conveyed the land to S. O. White. On September 27, 1916, S. O. White, by quitclaim deed conveyed the land to his father-in-law, J. B. Leach, who on the

same day executed to the attorney of S. O. White a power of attorney.

This suit is to cancel the deed of August 25, 1916, on the grounds of fraud, and to cancel the bill of sale, the deed from Punneo to White and Punneo, the deed from Punneo to White, the deed from White to Leach and the power of attorney executed by Leach, for the reason that these instruments were a cloud upon the title of plaintiffs to the lands involved.

The bill of sale was not acknowledged by a notary, was not indexed or recorded as is required of a real estate mortgage, and was placed among the files of the chattel mortgages. The plaintiff alleges that he therefore knew nothing of the bill of sale, that he purchased the lands in good faith paying a valuable consideration.

There is no attempt to explain the irregularities of the bill of sale, none of the Punneos appeared as a witness—one witness did testify that in a conversation with White he told him that one of the Punneos said that Ed Punneo was indebted to J. S. Mullen for rent and the bill of sale given to the brother was to place the property beyond an execution.

At the time the Harrigans executed their deed to White there was paid Harrigan by White the sum of $620, which he borrowed from Leach, one of the other defendants. White also assumed and agreed to pay a mortgage on the land in the sum of $1,500.

In this suit a tender back of $620 was made in open court and refused by defendants. It is pleaded that Leach and the attorney to whom the power of attorney was granted were either connected with the fraud or knew of the fraud in the securing of the deed on August 25, 1916, from the Harrigans to White.

The only contest before the trial court was whether there was fraud in the securing of the deed above referred to from the Harrigans to White.

The history of the case is as follows: Oil was discovered in Carter county and developments were being had in the vicinity of the land involved and the land possessed a prospective oil value. Charley Punneo in 1916, nearly five years after the bill of sale had been executed to him, went to White, one of the defendants, and told him of this old bill of sale which was hidden away in the files of the chattel mortgages of the county clerk of Carter county, though he had remained silent for nearly five years knowing his brother had sold the lands to other parties. White agreed to secure the

land for him under this bill of sale 'for one-half of same. White was not an attorney but a clerk in the store of his father-in-law, J. B. Leach. White procured an attorney, the one to whom his father-in-law executed the power of attorney.

Charley Punneo executed to White and to his mother, Hannah Punneo, the deed of June ' 6, 1916, no consideration therein passing. Punneo was to be the owner of one-half of the land and White and his mother, Hannah Punneo, were to hold in trust for him this one-half. This deed of June 6, 1916, was placed of record on the day of its execution. It so happened that Harrigan was on a trade with other parties about this date, agreeing to sell 30 acres for $50 an-acre, which would pay off the mort-'gage then on the land leaving him the other portion clear of debt, but when the time came to close out the deal this deed from Punneo to White and Punneo was found of record defeating the sale. Harrigan commenced suit at once, to cancel the deed from Charley Punneo to White and Hannah Punneo dated June 6, 1916, as a cloud on his title, and while this suit was pending the transactions between White and the Harrigans in regard to the execution of the deed of August 25, 1916, from Harrigan to White, took place.

The history of this matter is as follows:

White, who lived at Comanche, accompanied by his lawyer went to the justice of the peace who prepared the bill of sale between the Punneos and secured from him an affidavit to that effect sworn to before a notary. They then went to the office of the county clerk of Carter county and under the seal of that office secured a certified copy of the bill of sale. then with blank deeds they went forth to prove there was good title in them—not to the attorney who had filed the suit to cancel the White-Punneo deed, but to the plaintiff himself. He and his attorney drove out in an automobile to the western part of Carter county first to the home of the father of Ed Harrigan, having gone there by mistake, then accompanied by the father went to the home of E. A. Harrigan. This is the time in which the deed of August 25, 1916, from the Harrigans to White was secured. It is alleged that the Harrigans were ignorant, uneducated and illiterate persons, not versed in business, but having to rely on others for advice as to business matters, and that White was a shrewd business man.

There was evidence introduced as to the education and experience of E. A. Harrigan, "that he had gone to school some five or six months, had got as high as McGuffey's Third Reader. His education being at a school in Board's bottom between the towns of Nebo and Daugherty in what is now Murray county, Oklahoma." He was 24 years of age. had a wife and a baby and had followed farming as a vocation and had. been making his own living since he was 15 years of age. On the other hand there was dealing with him to secure his deed to the land in question White, a clerk in a store, who had with him an attorney.

The father of E. A. Harrigan, from the evidence, appeared to possess little education. It is clearly to be seen .that in the arguments between the parties as to title to the lands the Harrigans were at a considerable disadvantage

The record is quite voluminous as to what took place at this meeting. It appears that White first talked to Harrigan, then, his attorney talked to him.

Bud Remington, called by the plaintiffs, testified as follows:

"That they (referring to White and his attorney) asked him (referring to Harrigan) in a short time what he was going to do. Mr. Harrigan said at that time he was going to. fight it through; and then Mr. White came up with a bill of sale on the place, he said he had the first bill of sale on the place, the oldest bill of sale from Ed Punneo to his brother, Charley Punneo, before he sold the land to McCown, it was filed for record and showed the date it was filed on, and then they said it was not properly filed, but it was the neglect of the clerk—fault of the clerk and it was just as good as if it was properly filed. He said it was a bill of sale from Ed Punneo to Charley Punneo, they was reading, and when young Harrigan said he guessed he would fight it through White says, 'We will beat you and McCown and oil companies.' They said to young Harrigan that it was a deed in the form of a bill of sale. They said if they had their law book so they could show him. That they went over this four or five times, not less than five, they repeated it over when he refused and then they would repeat it over, you know. I do not remember what the attorney for White said about the McCown deed being void."

J. C. Harrigan, father of E. A. Harrigan, called by the plaintiff, testified: That he was present the 25th day of August, 1916, when the conversation leading up to the execution of a deed by his son to White took place—

"I do not know that I can tell all the conversation—I can tell part of it; what I remember. They told him they had a bill of sale to the land, from Ed Punneo that was made back away ahead of McCown's deed and made to Ed's brother—we know him as

Dick—and went on to say this deed was all right, it was good and would stand up in court—said it was sorry got up but finally got a good deed out of——He told my son this and said he believed he would be protected as an innocent purchaser so he would get his money back then and there if he would make him a deed to the place, he held up this supposed to be certified copy, I believe he called it, he says, 'It will absolutely stand up'—they said they would buy him out, if they did not they was going to beat him any way. They said they had absolutely the oldest title. White talked some, then the attorney took it—White started and the attorney took it. The attorney said the title would stand up, that if he had his law book there he would show it to us, he wished he had it—my son traded his own cattle and stock with McCown for the place. He has been looking after his business since he was 21. You (referring to the attorney) made him believe all the time he did not have any deed, that his money was gone and this was his only chance to get it that it might be that he could get it out of the one from whom he purchased if he was worth it, if he could not get it out of him he would lose it—yes, I said I believe you was a lawyer and was telling the truth and knew what you was talking about. I believed myself that was the only way, I didn't know nothing about the land business. I had no experience, this is the first place I ever bought in my life."

E. A. Harrigan, the plaintiff, testified as follows:

"I will be 24 years old April 5th, next. My wife's name is Nora. We have got one little baby boy, born right in the house where we live. I have made two crops out there. I farm myself. I bought the land from W. H. McCown; I was to pay him $2,000, of which I paid him $500 in cash and gave a mortgage for the remainder, due in five payments, $300 at a payment. White and his attorney came to see me. There was present my father and Uncle Billie Pennington. They said they knew I bought as an innocent purchaser, and they wanted to get me out so they could go after McCown and Punneo, go after them and if they could not take the money back they would beat us all the same together. They drew a little piece of paper and says this is a deed in the form of a bill of sale and handed it to me; they said it was not put of record properly, but it would hold up as good as if it had been, that it wasn't their fault. He said he was not in fault; said something about they knew about it when they handed it to me; said it was a bad job; said the old justice at Pooleville made it out and it was a bad job, but they could make a good deed out of it. They went on to say that McCown would beat me out of what I paid him; that he was worth it now, but might not be later on. They left the impression that everybody else was going to crook me but them and they was coming straight; they said I was an innocent purchaser and wanted to pay me back my money and get me out between them and

McCown. They wanted to pay me the same money back that I had been out on the land. They said McCown's deed was void, and they had the only title to the land; that they were going to beat them and me, too, provided I would not take the money back now. I told them I had been down and looked over the record and I did not find what they said there. Pa says, 'you do not know where to look.' He (White) said it was there—'we checked it upon the records and it was absolutely as good as a warranty deed on the records.' I had agreed to sell 30 acres of the land to Dr. Potter and Morris Sass for $50 an acre, $1,500, the amount of the mortgage to McCown. They (White and his attorney) said the bill of sale covered all the 80 acres, and said the bill of sale would show that they had the only true title to the land. I did not read the bill of sale; I relied upon what they said. I sure would not have given any deed to it to White had I not believed their statements to be true that they had better title when I could sell 30 acres of it for $50 an acre and clear away what I got it for, what I had been out. I sold the land to White because they made me believe I had no title and they was going to beat me out of what I had been out on it. My best recollection I spent $252 of the money White paid me. My complaint is that they told me that they had a title absolutely better."

W. H. McCown, called by the plaintiff, testified:

"I bought the land in question from Ed Punneo; I have known Charley Punneo for several years; never heard of him asserting any title to the land until this thing came up. I sold the land to E. A. Harrigan, on August 25, 1916; the lands involved had a market value of $50 to $75 an acre."

Morris Sass, called by plaintiff, testified:

"That the market value of the land on August 25, 1916, was $75 per acre, that is, he had contracted a few days prior to that day with Harrigan to pay him $50 per acre, which they had contracted to sell at $75 per acre."

D. E. Barker testified:

"That the land had a market value for oil and gas on August 25, 1916; it was supposed to be worth $50 or $60 or $100 an acre; I would not take $150 an acre for mine about as near."

Wirt Franklin testified that he was in the oil business and that on August 30, 1916, White came and offered to sell him the lands in question, and that he offered him $50 an acre for all of it. But the trade was not consummated.

E. Dunlap testified "that on August 25, 1916, the market value of the lease on the land was $40, $50 or $60 an acre, around $50; that in the later part of September following the McMann well came in in the same section,

which would increase the value very materially."

S. C. White, in behalf of himself and other defendants, testified:

"That he lived in Comanche; was in the grocery business; never had a lawsuit. In June, 1916, old man Punneo and Charley came to the store with an instrument signed by Morris Sass and a note signed by Wade McCown asking Charley to sign a deed and mail to Morris Sass. I came to an agreement to look after the land for one-half of it. A few days later Charley Punneo executed a deed to Hannah Punneo and myself; Hannah was Charley's mother. The same day, after I got the deed from the Harrigans, Hannah Punneo executed a deed to me. I did not pay her anything for the deed. They were putting the rest of the title in me that I might sell it. I saw Harrigan for the first time the day I took title from him. I did not know of Harrigan's deed when Charley deeded the land to me and his mother; I found the bill of sale in July, 1916, and took a certified copy; I went out to see Harrigan; my attorney went along. We told him we had a bill of sale from Ed Punneo to Charley Punneo; I had the certified copy. Both of the Harrigans, father and son, looked at it; we discussed the way the words were spelled. I told him the original was in the clerk's office in the chattel mortgage files; I told him it was a true copy, and the reason why people could not find it they had been looking at the wrong place all the time. I called it a bill of sale. We laughed over the way the words were spelled. They asked my attorney whether the bill of sale would transfer land. My attorney says, 'I am White's lawyer,' and he did not think they would rely upon what he said. The father spoke up and says that this is the first time he ever knew one could sell land by a bill of sale, and asked the opinion of my attorney, who told him that where the parties knew about the bill of sale the land could be delivered, but it couldn't outside of the parties that knew about it; that was his opinion. I talked with my attorney; he said I ought to go out and they would settle it out of court, as the winner in a lawsuit is the loser. I wanted my attorney along to draw the papers. My attorney told them they would be protected to the amount they had in the land anyway it went, and he was an innocent purchaser. I paid him $618 and agreed to pay the mortgage of $1,500; Harrigan and his wife made me a deed and signed an agreement to dismiss the suit to cancel deed, which suit also included damages. Harrigan's father asked his son if he could get his money out of McCown's deed, who replied that he would rather have $618 than any man's deed, as a bird in a cage is worth two in the bush. Harrigan and wife went across line into Stephens county where the signature and acknowledgment of deed was had before a notary public. We had with us and showed to Harrigan the affidavit of the justice and the deed of Charley Punneo to him and Hannah Punneo. I showed him everything,

he had put everything on the table for him to look at. We told him that Ed Punneo told us that McCown knew of the bill of sale. I got the $630 from my father-in-law, Mr. Leach, and I told him about the transaction. I had part of the land sold for $50 an acre. Mr. Leach and myself are partners in business. The Punneos have an interest in the lands; they got half of it. I did not tell my father-in-law all the transactions; I kept him posted pretty well; I told him Punneo was getting half of it."

The evidence of the attorney was substantially as given by White, claiming that no unfair advantage was taken of Harrigan.

At the conclusion of the evidence, the plaintiffs were permitted, over the objections of the defendants, to amend their petition by alleging facts largely in keeping with the evidence of White and his attorney as to what they did in the securing of the deed from Harrigan and that Charley Punneo still retained an interest in the lands. At the request of defendants, the court made findings of fact and conclusions of law. The court found that the deed of August 25, 1916, from the Harrigans to White was secured by fraud, and that the other deeds affecting the Harrigans' title to the lands involved were a cloud thereon.

The defendants assign as error: First, that the court erred in that the findings of facts are contrary to and unsupported by the evidence; second, in failing to make certain findings; third, in overruling motion of defendants for judgment on pleadings; fourth, in the admission of incompetent evidence; fifth, in permitting plaintiffs to amend their petition; sixth, in rendering judgment contrary to the evidence and failing to enter judgment for the defendants.

We will first discuss the sixth assignment of error, or that part thereof that states the judgment is contrary to the evidence. The defendants contend that misrepresentations by them, if any, were of law and not of fact, and for that reason an action for fraud cannot be based thereon, citing as authorities: Mutual Life Ins. Co. v. Pheney, 178 U. S. 327; Thompson v. Phoenix Ins. Co., 75 Me. 55, 46 Am. Rep. 357; Phenigan v. Smith, 161 Cal. 362, 119 Pac. 494.

In Bigelow on Fraud, vol. 1, pp. 487 and 488, it is stated:

"Generally speaking a misrepresentation of law affords no ground of redress or relief; the misrepresentation should be of fact. * * * The ground upon which this rule rests is often said to be that all men are presumed to know the law; 'ignorantia legis neminem excusat.' But this is not quite satisfactory. It may be doubted if the maxim was ever

intended to excuse fraud; its more natural explanation is that it was intended not so much as a bar to the innocent as a warning to the guilty, and as a rule for upholding the performance of contracts and of written instruments. The law is a special branch of learning, like the higher mathematics; and to know its peculiar features one must make one's self a specialist in the subject. * * * It is not, however, universally true that a misrepresentation of the law is not binding upon the party who made it. * * * Indeed where one has had superior means of information, professes a knowledge of the law, and thereby obtains an unconscionable advantage of another who is ignorant, and has not been in a situation to become informed, the injured party is entitled to relief as well as if the misrepresentation had been concerning matter of fact."

In 12 R. C. L. pp. 295-296, it is stated:

"As a general rule fraud cannot be predicated upon misrepresentations as to matters of law, nor upon opinions on questions of law based on facts known to both parties alike. * * * Reasons given for this rule are that everyone is presumed to know the law, both civil and criminal, and is bound to take notice of it, and hence has no right to rely on which representations or opinions, and will not be permitted to say that he was misled by them. * * * The rule that fraud cannot be predicated on misrepresentations as to matters of law may be rendered inapplicable by the existence of peculiar facts and circumstances. * * * The same is true where one who himself knows the law deceives another by misrepresenting the law to him, or knowing him to be ignorant of it, takes advantage of him through such ignorance, or where the person to whom the representations are made relies upon the supposed superior knowledge and experience of the other party and on his statement that it is unnecessary or inadvisable for him to consult a lawyer."

In 20 Cyc. 19-20, it is stated:

"It is presumed that the law is equally within the knowledge of all persons, and assertions of law, although false, such as misrepresentations as to the legal effect of a particular written instrument or obligation, are as a general rule regarded as mere expressions of opinion and cannot be made the basis of an action for deceit. Where, however, a confidential relation exists between the parties of which one knowingly avails himself to mislead the other by a misrepresentation of the law or where, as has been said, one knowingly takes advantage of the other's actual ignorance of the law to mislead him by misstatements thereof, an action may be maintained."

The general rule that a misrepresentation of law affords no grounds of redress or relief has its exceptions, as is seen by the law laid down by the above text-book writers. One of the exceptions is that where one of the parties has had a superior means of in-

formation, professes a knowledge of the law, and thereby obtains an unconscionable advantage of another who is ignorant, then a cause of action will lie as if the misrepresentations had been concerning a matter of fact. If the representations here were of law as contended by the defendants, then the next question to consider is whether the law was misrepresented. In this case defendants made representations to the plaintiff as to the validity of the bill of sale and the invalidity of the deed to Harrigan. Was White, or his attorney, justified from a legal standpoint in the making of such representations? The bill of sale from one brother to another brother was not acknowledged, neither was it recorded or indexed in a manner as provided by law. There was the description of personal property therein. The description of land did not describe any land, and it had been filed away as though it were a chattel mortgage. That was what the face of the bill of sale showed. In addition to that there was the act of Charley Punneo in remaining silent for nearly five years, until the land had possessed a speculative oil value. There was no consideration for the White-Punneo deed. All of this marks the instrument as one of a most doubtful nature. It becomes doubly doubtful when upon trial no effort was made by the defendants to uphold the good faith of the Punneo bill of sale between the brothers, though it might be well to say it was claimed that one of the Punneos was out of the state at the time of trial, but the records fail to disclose that the cause was asked to be continued for that reason. Another suspicious circumstance is that White and his attorney went to Harrigan to argue law, as they contend, and not to his attorney. It is true there is no legal obligation upon one to go to the lawyer, but it is undoubtedly the better policy to do so, especially when the difference is claimed to be one of law. Harrigan, on the other hand, had a good record title, having purchased the land in good faith. for a valuable consideration.

A consideration of the above facts forces us to the conclusion that White had no title under the bill of sale, and this was known to him and his attorney; that they knew that Harrigan had a good title under his deeds, and that the representations as to title by White and his attorney deceived Harrigan as to his title, and secured to them an advantage, to wit, title to his lands—a deed was immediately prepared, executed, acknowledged and delivered before Harrigan could place himself in a situation to be informed as to his rights.

The next question is whether or not Harri-

gan acted under ignorance in the execution of his deed to White. The record shows that in all his past life he had been to school some five or six months at a country school, in what is now Murray county, and this was before he had reached his 15th year; that he had gone as far as McGuffey's Third Reader; that he was 23 years of age at the time the deed was executed, and was a farmer. We would therefore say that Harrigan, when it came to passing upon the legality of the deeds in question, was an ignorant man, and owing to the fact that White was represented by an attorney, this necessarily meant that he (White) had superior means of information and professed a knowledge of the law. Did Harrigan act upon the representations made to him by White and the attorney? There was undoubtedly some impelling influence operating upon his mind, which caused him to sell his property to White for about half its value. The record does not disclose any influence other than the representations made by defendants to him.

It appears from the evidence set forth above that after much argument by the parties, on the day the deed was executed, the father of E. A. Harrigan, who was present, was convinced by the attorney that what he said in reference to title was true and, in his ignorance, he bowed to the superior knowledge of the attorney, for he stated: "Yes", he said, "I believe you was a lawyer and was telling the truth and knew what you was talking about. I did not know nothing about the land business."

E. A. Harrigan testified:

"They left the impression that everybody else was going to crook me but them, and they was coming straight. * * * They wanted to pay me the same money back that I had been out on the land. They said Mc-Cown's deed was void and they had the only title to the land and they were going to beat them and me, too, provided I would not take the money back. * * * I relied upon what they said. I sure would not have given any deed to it to White had I not believed their statements to be true, that they had better title, when I could sell 30 acres for $50 an acre. I sold the land to White because they made me believe I had no title, and they were going to beat me out of what I had been on it."

A consideration of this evidence, and the fact that Harrigan made a sacrifice of practically one-half the value of his land, when the record does not show that there was any influence other than the representations by defendants operating upon his mind, leads us to the very convincing certainty that he believed the representations made and acted thereupon to his prejudice and to the benefit of the defendants. We find that the amended petition sets forth a cause of action based on fraud and the evidence was sufficient to enter judgment thereon in favor of plaintiffs.

Now in regard to the first and second assignments of error, we have carefully examined the findings of the court and find that the same are in keeping with the evidence on all material issues, and that a finding was had on all material issues.

The defendants contend in the third assignment of error that the motion for a judgment on the pleadings should have been sustained by the court for the reason that no reply was ever filed to the answer. We do not find under the pleadings in this state that a reply was required, but be that as it may, the defendants made no objections to going to trial for failure to file a reply, so thereby waived a reply if one was required. Johnson v. Douglas, 8 Okla. 594, 58 Pac. 743; Burford v. Hughes, 75 Oklahoma, 182 Pac. 689. The mere request for a judgment on the pleadings without specifically calling the attention of the court to the fact that no reply had been filed was not sufficient. The court's attention to the failure to file a reply must be given and an objection to going to trial without one must be made.

We have examined defendants' fourth assignment of error, and find that there is no prejudicial error therein. This is in reference to admission of evidence the defendants claim not to be at issue, and to the exclusion of other evidence.

The defendants contend in their fifth assignment of error that the court erred in permitting the amended petition to be amended after the evidence closed. This amendment largely covers the facts brought out by White and his attorney in their evidence adduced at the trial. The defendants contend that a pleading cannot be amended to conform to the evidence if the evidence went in under objections. The evidence in this case which went in under objections was competen+ under the first amended petition. We believe the trial court committed no error in permitting this amendment to the amended petition, but in view of the fact that this opinion holds that the amended petition, on which the plaintiffs went to trial, stated a cause of action and the evidence thereunder justified the verdict, a further discussion of this assignment of error is not necessary.

The evidence in this case shows that none of the parties who deraign their title or interest from bill of sale of Charley Punneo

hold the same in good faith. They were familiar with what Charley Punneo and S. O. White did to secure title to the lands involved, and the evidence further shows that the bill of sale, or any claim Charley Punneo had to the land, was unknown to McCown or Harrigan. The contention that Nora Harrigan, wife of E. A. Harrigan, who joined with him in the deed, was not a proper party plaintiff, is without merit.

The plaintiffs tendered in the pleadings to defendants $620, the sum so paid them by defendant S. O. White, which amount he borrowed from his father-in-law, J. B. Leach, and further made a tender of this sum in cash in open court at the time of trial. They further admit that J. B. Leach has paid to W. H. McCown the sum of $353.50 to apply as payment on notes executed by E. A. Harrigan to W. H. McCown, for which a mortgage on said lands was given. The plaintiffs in their brief express a willingness that the court affirm this judgment upon condition that this money be paid back by them.

The court will not render a conditional judgment, but will direct E. A. Harrigan, plaintiff, within 90 days from date mandate is spread of record, to pay to the court clerk of Carter county for the benefit of J. B. Leach, one of the defendants, the sum of $353.50, with interest thereon at the rate of 6 per cent. per annum from January 1, 1917, and in default of payment all rights and remedies the mortgagee had to enforce payment of same are subrogated to J. B. Leach.

Neither of the attorneys appearing for the defendants in this cause was their attorney at the time the deed of August 26, 1916, was executed, in which the finding here is that a fraud was perpetrated on plaintiffs.

The judgment is affirmed.

OWEN, C. J., RAINEY, McNEILL, and PITCHFORD, JJ., concur.

JOHNSON, J., dissents,