PENN MUT. LIFE INS. CO. *v.* NUNNERY.

(Division A. April 13, 1936.)

[167 So. 416. No. 31967.]

Percy & Farish, of Greenville, for appellant.

. 200

Ramsey Russell and **Wynn, Hafter & Lake,** all of Greenville, for appellee.

Argued orally by **H. P. Farish**, for appellant, and by **Jerome S. Hafter**, for appellee.

**Smith, C. J.**, delivered the opinion of the court.

The appellee secured a judgment against the appellant on a life insurance policy of one thousand dollars, issued by the appellant to the appellee's husband, Lane Nunnery, in which she was the beneficiary. The policy contained a double indemnity clause; and there was a verdict and judgment for two thousand dollars.

The appellant requested, but was refused, a directed verdict as to its liability at all, and as to its liability on the double indemnity clause. In support of its contention that a general verdict should have been directed for it, the appellant says that the evidence discloses (1)

that it paid the beneficiary, the appellee, the sum of five hundred dollars in full settlement of any claim she might have against it under the policy; (2) that the insured made a false answer to a material question in his application for the policy. As to the settlement with the appellant, the appellee says that her agreement thereto was fraudulently obtained by a representative of the appellant.

1. Some time after the death of the insured, a special agent of the appellant called upon the appellee at her home where she was with only her children, one of whom was seventeen years old, and another fifteen years old. What then occurred thus appears in the testimony of the appellee without contradiction by the appellant:

"On the morning of January 25, 1935, about eleven o'clock a man walked upon on the porch, knocked and I went to the door and he said: 'John K. Cooney is my name, I am representing the Penn Mutual Life Insurance Co. from the home office in Philadelphia.' I invited him in and he come in and after he warmed himself up a bit he said 'My business this morning is in regard to the policies your husband held in the Penn Mutual Life Insurance Co.' and he said: 'Would you mind if the children left the room?' I said 'No not at all' and they went into the other room. He said 'Mrs. Nunnery, it is my unpleasant duty to inform you your policies are no good.' I said 'Do you mean they are no good' and he said 'All the Company lawfully owes you on these policies is the premiums you paid out' and I said 'Why is it that way' and he said 'Do you have the policies' and said 'Would you mind getting them' after I said 'Yes, I have them,' and I said 'No' and I got out the policies and he took the first policy made out in April and turned to the application sheet and pointed out one question to me.

"Q. See if you can find that question? A. Yes. 'Have you ever used intoxicating liquor to excess?'

"Q. What is the number of that question? A. It is number 13. 'Have you ever used intoxicating liquor to

excess?' and he said Mr. Nunnery's answer to that question was 'No' and he said 'The Company has proof Mr. Nunnery has used intoxicating liquor to excess during his life.'

"Q. Did he tell you that voided both policies or one policy? A. Both. . . . He said 'By law the company only owes you the premium paid out on both policies.' He said 'They understand the circumstances and are in sympathy with you and told me to offer you a settlement of $500 for the release on these policies' and I thought it over a minute.

"Q. Did he tell you anything about what was meant by excess—as to why that policy was void? A. He said being drunk in his lifetime was drinking to excess.

"Q. Mrs. Nunnery, had you ever had occasion to read a life insurance policy or did you know anything about life insurance policies at all? A. No sir, I never read the policy over.

"Q. Have you ever had a policy on your own life? A. No sir.

"Q. Have you ever had any dealings at all with life insurance policies? A. No sir.

"Q. What did Mr. Cooney say about his occupation? A. He said that was his business settling and adjusting policies for the Penn Mutual Life Insurance Co.

"Q. Were you taken by surprise when he told you this policy was void? A. Yes sir.

"Q. Did he say anything about when he had to leave? A. Yes sir. He had a printed release right there and he told me to read it over and told me 'I would like for you to decide as soon as you can, I am leaving this evening for Birmingham and from Birmingham, fly straight to my home' and he said he wanted to go home as soon as possible.

"Q. What did he say if you didn't sign that release what probably would happen? How much would you get? A. He said I could either sign the release or the company would only owe me the premiums.

"Q. Did you have confidence in this insurance agent? A. Yes sir.

"Q. Did you believe he was telling the truth? A. Yes sir."

The appellee then agreed to the offered settlement, received a check from the special agent for five hundred dollars, and executed a release to the appellant from liability on the policies. Thereafter, on the same day, after consulting an attorney, she notified the appellant that she would repudiate the settlement, offered to return the check, and, on the offer being refused, did not cash the check. The appellant introduced no evidence as to the use by the insured of intoxicating liquor, but it appears from the testimony of the appellee that the insured, prior to the issuance of the policy, drank intoxicating liquor at irregular, though at times not infrequent, intervals, and was at times under the influence thereof, though not drunk, except probably (the evidence being somewhat in conflict thereon) on one occasion.

The appellant had issued two policies to Lane Nunnery, payable to the appellee. The application for the one here sued on contained the question and answer hereinbefore set forth, but the other did not.

The representation made by the appellant that the negative answer to the question, "Have you ever used intoxicating liquor to excess?" would void both policies was, of course, untrue, for the application for one of them contained no such question and answer. It was also untrue as to the other policy (the one here sued on), the application for which did contain that question and answer. The word "use" in this connection means "To make use of, esp. habitually or customarily; for a regular custom; to practice or make a practice of." Webster's New International Dictionary (2 Ed.). Doing a thing once does not indicate a custom or habit so to do. Provident Sav. Life Assur. Society v. Exchange Bank of Macon (C. C. A.), 126 F. 360 (a case directly in point); 66 C. J. 75; 37 C. J. 453.

But it is said that the evidence does not disclose that the representation was not made by the agent in good faith. His good faith is not the test. If the representation was false, and the appellee was justified in relying upon it, then she agreed to the release under a mistake into which she was led by the affirmative act of the appellant's special agent, and she therefore is not bound thereby. 2 Restatement, Contracts, sec. 502; Oswald v. McGehee, 28 Miss. 340; Rimer v. Dugan, 39 Miss. 477, 77 Am. Dec. 687; Davis v. Heard, 44 Miss. 50.

The appellant says, further, that the misrepresentation was one of law and not of fact. The misrepresentation was akin to, and may be, a misrepresentation of fact; but we will assume, for the purpose of argument, that it was a misrepresentation of law. A misrepresentation of domestic law, which is but a form of the expression of an opinion, does not ordinarily constitute a predicate for a fraud. For it to do so, it must be accompanied by some inequitable conduct by the person making it, which induced another to rely and act thereon. 2 Pom. Eq., secs. 842-847. One instance of such conduct is where the maker of misrepresentations has or professes to have knowledge of the law superior to that of a person to whom the representation is made, and thereby induces such person to rely and act on the misrepresentation. 2 Restatement, Contracts, sec. 474, comment d; Restatement, Torts (Ten. Draft No. 13), subd. 2 of sec. 621, comment d; Ellis v. Gordon, 202 Wis. 134, 231 N. W. 585; Allison v. Doerflinger Co., 208 Wis. 206, 242 N. W. 558; White v. Harrigan, 77 Okla. 123, 186 P. 224, 9 A. L. R. 1041; Bigelow on Frauds, 487 et seq.; 3 Williston on Contracts, secs. 1495-1591; 26 C. J. 1209; 12 R. C. L. 296; Smith on Law of Frauds, sec. 15; 6 Couch, Cyc. of Ins. Law, sec. 1448. Such is the case here; therefore the appellant was not entitled to a directed verdict on this issue.

2. Was the appellant entitled to a directed verdict on the ground that the insured was murdered by the appellee? The evidence as to the cause of the insured's

death was, in substance, that, when angry with the appellee and probably under the influence of intoxicating liquor, the insured approached the appellee with a pistol in his hand and either pointed it at her or was raising it for that purpose, whereupon the appellee immediately shot and killed him with a shotgun that she had procured for protection against him. This evidence warrants a finding by the jury that the appellee killed the insured in necessary self-defense; consequently, the appellant was not entitled to a directed verdict on this issue.

3. The application, as hereinbefore set forth, for this policy, contained the following question and answer: "Q. Have you ever used intoxicating liquor to excess? A. No." The appellant says that the evidence discloses that this answer was false. The evidence as to the use of intoxicating liquor by the insured has been hereinbefore set forth, and, as there said, being drunk once does not of itself alone indicate the use of intoxicating liquor to excess.

The words "to excess" in this connection are equivalent to "excessively" or "intemperately." "We do not know of any established legal definition of those words. As they relate to the customs and habits of men generally in regard to the use of intoxicating drinks, and as the observation and experience of one man on that subject is as good as another of equal capacity and opportunities, their true meaning and signification would seem to be a question addressed rather to the jury than to the court. While there may be on one hand such a clear case of intemperate habits as to justify the court in saying that such and such facts constitute a condition of habitual intemperance, or on the other such an entire absence of any proof, beyond an occasional indulgence in the use of ardent spirits, as to warrant the opposite conclusion, yet the main field of inquiry, and the determination of the question within it, must be submitted to the jury, and the question on this submission must be decided by them." Northwestern Mut. Life Ins. Co. v.

Muskegon Nat. Bank, 122 U. S. 501, 7 S. Ct. 1221, 1223, 30 L. Ed. 1102.

The evidence here is not such as to justify a directed verdict for the appellant.

4. This brings us to the double indemnity clause of the policy, which is as follows:

"The Penn Mutual Life Insurance Company of Philadelphia agrees to pay One Thousand Dollars, in addition to and together with the face amount of this Policy, upon receipt of due proof that the death of the insured resulted solely from bodily injuries effected directly and exclusively by external, violent and accidental means, and that such death occurred within ninety days after sustaining such injuries.

"This Double Indemnity Benefit shall not be payable if the death of the insured resulted directly or indirectly . . . from committing a felony. . . ."

The grounds of the appellant's claim that no liability arises under this clause of the policy are: (1) The insured's death was not accidental within the meaning of the policy, for the reason that (a) it resulted from the commission by him of a felony, and (b) was provoked by a deadly assault made by him on the appellee; (2) if not so provoked, the appellee murdered the insured, and therefore cannot recover.

The substance of the evidence of the manner of the insured's death has been hereinbefore set forth, from which it appears that the appellee either killed the insured in self-defense or murdered him; no element of manslaughter appearing therein. If she killed him in self-defense, specifically if she killed him in order to defend herself from an unprovoked deadly attack made by him on her, then his death was not accidental within the meaning of this clause of the policy. Lavender v. Volunteer State Life Ins. Co., 171 Miss. 169, 157 So. 101; Meister v. General Accident Corporation, 92 Or. 96, 179 P. 913, 4 A. L. R. 718, note thereto. We are not here dealing with the case of a simple assault by the insured,

but one with an assault by the insured with a deadly weapon. If the insured did not assault the appellee and gave her no reason to believe that her life was in danger or that she was in great bodily harm, then in killing him she was guilty of murder, and therefore cannot recover. "It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired." Mutual Life Ins. Co. of New York v. Armstrong, 117 U. S. 591, 6 S. Ct. 877, 881, 29 L. Ed. 1000. It is true that the evidence does not disclose, and we will say negatives, any idea that the appellee killed the insured in order to collect the policy. But that fact is of no consequence here. This is in accord with the public policy of this state as reflected by sections 1413 and 3566, Code 1930, which prohibit one who has willfully killed another from inheriting property from him or taking property under a will by him. On the evidence the jury could have found only that the death of the insured was not accidental within the meaning of the policy, or that he was murdered by the appellee. In either event, the appellee cannot recover on the double indemnity clause of the policy. There was nothing, therefore, to submit to the jury on this issue, and the appellant's request for a directed verdict thereon should have been granted.

The judgment of the court below will be reversed insofar as it awards a recovery on the double indemnity clause of the policy, and a judgment will be rendered here for the appellee for one thousand dollars and interest at six per cent per annum from the date of the rendition of the judgment in the court below, together with all costs incurred in the court below.

Reversed, and judgment here for appellee.