HUNT OIL COMPANY *v.* BERRY

No. 39902 March 19, 1956 86 So. 2d 7

*Jones & Stratton,* Brookhaven, for appellant.

*James B. Sykes,* Mendenhall; *Satterfield, Ewing, Williams & Shell,* Jackson, for appellee.

238

HOLMES, J.

The appellee filed his original bill against the appellant in the Chancery Court of Simpson County seeking the partial cancellation of an oil, gas and mineral lease executed by the appellee and his wife to the appellant dated April 15, 1944, and seeking the partial cancellation of a purported amendment to said lease dated Janu-

ary 12, 1954, and seeking the recovery of damages in the sum of $17,340.00 alleged to have been sustained by the appellee as a result of disparagement of appellee's title caused by the assertion by the appellant of mineral rights under said amendment, which amendment is was alleged was procured by legal fraud perpetrated upon the appellee by the appellant's agent. After a full hearing, the chancellor rendered a decree cancelling the aforesaid lease and amendment insofar as the same related to all lands in the lease described except 40 acres of land described as the NW¼ of the NW¼ of Section 1, Township 9 North, Range 19 West, Simpson County, Mississippi, and awarding to the appellee damages in the sum of $12,460.00. From this decree, the appellant prosecutes this appeal.

Some of the essential facts are undisputed. The appellee was the owner of approximately 620 acres of land in Simpson County, Mississippi. On April 15, 1944 he and his wife executed an oil, gas and mineral lease on said land to the appellant. The lease was for a primary term of ten years and contained a pooling agreement authorizing the lessee to pool any part of the leased acreage with other lands in the immediate vicinity thereof in a unit or units of not exceeding 40 acres each, and further providing that if production should be found on the pooled acreage, it would be treated as production from the leased acreage. On January 12, 1954, the appellee and his wife, at the instance of appellant's agent, W. K. Murphy, executed an amendment to the aforesaid lease amending the pooling clause therein so as to eliminate the restriction as to the side of the pooled unit, and forthwith filed said instrument for record. The cancellation of the lease and the aforesaid amendment was sought as to all of the land in said lease described except 40 acres described as the NW¼ of the NW¼ of Section 1, Township 9 North, Range 19 West. After the execution of the aforesaid amendment, the aforesaid 40 acres were

pooled by the appellant in a unit of 320 acres and included in Gwinville Gas Unit 68, styled "M. O. Berry, et al No. 1." A well was actually drilled upon the land other than that of the appellee in this unit and completed as a producer on March 29, 1954. The said 40 acres of land belonging to the appellee and included in said unit were located about 3½ miles from the center of the Gwinville Field.

The drilling of a well in the immediate area of the lands of the appellee was begun on April 5, 1954, and was in the process of drilling when the primary term of the aforesaid oil, gas and mineral lease expired on April 15, 1954. This well was completed as a dry hole on April 29, 1954.

On April 23, 1954, Earl R. Wilson obtained from the appellee and his wife a lease on 180 acres of the land included in the aforesaid oil, gas and mineral lease dated April 15, 1944 at $30.00 per acre, and on the execution of said lease to the said Earl R. Wilson, he gave his draft to the appellee for $5,400. Discovering immediately thereafter that there was of record the amendment obtained by Murphy and that the entire lease executed by the appellee and his wife to the appellant was in effect by reason of the production on the unit styled "M. O. Berry, et al, No. 1," he recalled his draft and cancelled the transaction. The appellee in this suit seeks recovery of said sum of $5,400.00 as damages, as well as recovery for the difference in the market value of oil rights before and after the dry hole came in as to the balance of the land described in the aforesaid lease dated April 15, 1944.

 The appellant first contends that the court was without jurisdiction because of the absence of a necessary and indispensable party, namely, Mrs. Etta Berry. It is the position of the appellant that Mrs. Berry, as one of the lessors in the lease dated April 15, 1944, was the owner of royalty rights thereunder and that she

was, therefore, an interested and indispensable party to the action to cancel the said oil, gas and mineral lease. It was alleged in the original bill of complaint that the appellee, F. C. Berry, Sr., was the owner of the land involved. This allegation was broad enough to include the ownership of the entire title to the land, including all estates therein, as well as all mineral and royalty rights therein. The appellant in its answer expressly admitted this allegation of the original bill. Under the allegations of the bill and the admissions of the answer, it is, therefore, to be taken as true that the appellee was the sole owner of the land and all mineral and royalty rights therein. It follows, under the allegations of the bill and the admissions of the answer, that Mrs. Etta Berry was not the owner at the time of the institution of the suit of any mineral or royalty rights in the land in question or the owner of any interest in the land, and hence was neither a necessary nor proper party to the proceeding.

It is further disclosed by the record that the appellant's contention that the court was without jurisdiction because of the absence of a necessary and indispensable party was not made in the trial court and that the point was not raised as a matter of fact until raised on this appeal. It further appears from the record that F. C. Berry, Sr. and his wife, Mrs. Etta Berry, have filed in this Court a document wherein Mrs. Berry disclaims any interest in this proceeding or in the subject matter of this suit, and wherein she asserts that she has no interest in the subject matter of the suit and had none at the time of the filing of the suit, and agrees to be bound by any decree rendered in this cause. Nevertheless, the aforesaid document incorporates therein a motion that the said Mrs. Berry be made a party to this suit. It is not necessary for us to pass upon the propriety of the filing in this Court of the document mentioned, nor is it necessary for this Court to resort to a consideration of that document and of Mrs. Berry's disclaimer,

since under the allegations of the bill and the admissions of the answer it definitely appears that Mrs. Berry is not now, and was not at the time of the filing of the suit, the owner of any interest in the lands in question or the mineral and royalty rights therein, and is not a necessary and indispensable party to the suit. We are of the opinion, therefore, that there is no merit in this contention. There being no necessity for the motion that Mrs. Berry be made a party, the said motion is overruled.

It is next contended by the appellant that the representations, if any, made by Murphy in procuring the amendment dated January 12, 1954 were not such as to constitute a legal fraud in the procurement of the document, and that the evidence is insufficient to support the chancellor's finding that said document was procured through misrepresentation amounting to a legal fraud. The evidence as to the circumstances under which the appellee and his wife signed the amendment dated January 12, 1954 was conflicting. The chancellor by his decree found as true the evidence introduced on behalf of the appellee on this issue. The proof for the appellee on this issue was substantially as follows:

██ ██ Murphy, the admitted agent of the appellant, came to the home of Mr. and Mrs. Berry on January 12, 1954. He first contacted Mr. Berry, who was engaged at the time in an effort to extinguish a fire just across the road from his home. Murphy informed the appellee that he had a document which he wanted him and his wife to sign. He told the appellee that the Hunt Oil Company, his employer, wanted to form a unit of 320 acres embracing therein the NW¼ of the NW¼ of Section 1, Township 9 North, Range 19 West, comprising 40 acres, which 40 acres was a part of the land covered by the oil, gas and mineral lease dated April 15, 1944. The appellee made specific inquiry of Murphy as to whether or not the instrument in question included any of the

other land in the lease. Appellee knew that the primary term of the lease would expire on April 15, 1954, and by signing the proposed instrument in question he did not want to affect any of the other land in the lease, but he was willing to include in the pooled unit the aforesaid 40 acres. Murphy told the appellee, and also later told the appellee's wife after they had gone into the house, that the instrument in question included no other land in the lease except the aforesaid 40 acres. Murphy started to read the instrument to the appellee and the appellee asked him just to explain the instrument to him as he knew little about such matters and couldn't understand it by a reading of it. Murphy then, according to the appellee's proof, explained the instrument to the appellee and later to his wife, assuring both of them that it had no application to any land in the lease other than the 40 acres in question. Murphy admitted in his testimony that after he had obtained the signatures of the appellee and his wife to the document and left with it, he left the appellee and his wife under the understanding that the instrument in question did not apply to any land in the lesse other than the 40 acres referred to. This evidence on the part of the appellee was sought to be contradicted in part by Murphy but the chancellor resolved all conflicts in the evidence in favor of the appellee and found that the signatures of the appellee and his wife to the amendment were obtained through a misrepresentation of fact which amounted to a legal fraud. The appellant contends that this finding of the chancellor was error and that the evidence is insufficient to establish the fact that the amendment to the lease was procured through a misrepresentation of fact which amounted to a legal fraud. In view of the evidence on behalf of the appellee, which the chancellor by his decree found to be correct, we think that the appellant's contention is not well founded.

■■■ It is argued by the appellant that the appellee and his wife signed the instrument in question without reading it and not as the result of any misrepresentation of fact or as the result of any inducement on the part of appellant's agent to sign it without reading it, and that if the appellee has suffered loss as a result thereof, it is because of his own folly. The proof for the appellee shows that the appellee asked the appellant's agent to explain the instrument to him instead of reading it to him, as he knew nothing about such matters and probably would not understand it if it was read to him. The appellant's agent then undertook to explain to the appellee the instrument in question, and in so doing, represented that the instrument included only the 40 acres hereinbefore referred to and did not include the other land of the appellee, notwithstanding the fact that the instrument in truth and in fact included all of the land described in the original lease dated April 15, 1944. We think that under the circumstances the appellee had a right to rely upon the appellant's agent and that he did rely thereon.

In 12 Am. Jur., Contracts, Section 145, the rule is stated as follows: ''The rule that a person who fails to have a contract read to him before signing it can have no redress does not apply in the case of fraud or false representations by which he is lulled into security or thrown off his guard and deceived. If a person is ignorant of the contents of a written instrument and signs it under a mistaken belief, induced by misrepresentation, that it is an instrument of a different character, without negligence on his part, the agreement is void.''

The principle has been applied by this Court in cases of contract. In the case of Penn Mutual Insurance Co. v. Nunnery, 176 Miss. 197, 167 So. 416, the Court said: ''But it is said that the evidence does not disclose that the representation was not made by the agent in good faith. His good faith is not the test. If the representa-

tion was false and the appellee was justified in relying upon it, then she agreed to the release under a mistake into which she was led by the affirmative act of the appellant's agent and she therefore is not bound thereby.''

In the case at bar, according to the appellee's proof, the appellee relied upon the representation made by the appellant's agent that no land was included in the instrument except the 40 acres of land hereinabove mentioned. He agreed to sign the instrument under such circumstances and, therefore, under a mistake into which he was led by the affirmative act of the appellant's agent.

In the case of Touchstone v. Bond, 78 So. 2d 463, the Court said: ''A representation by a seller of a material fact inducing the purchase is a fraud in law although the seller may be ignorant of the truth of the statements.'' In the same case the Court continued: ''Now if McLendon told Bond the car was in good condition, that the motor had been reconditioned, that there was nothing wrong with it, that the car was in A-1 condition and that recently the motor had been overhauled, and these statements induced Bond to purchase the car, and the statements were untrue, then Bond had the right to avoid the contract of purchase.''

It can not be doubted under the proof in the case at bar that the appellee and his wife when they signed the instrument in question understood that the instrument included only the 40 acres above mentioned and not the other land of the appellee. This understanding was the result, according to the appellee's proof, of the representation made by the appellant's agent, which representation was false, and induced the signing of the instrument by the appellee and his wife. The agent Murphy himself admitted that after the instrument was signed and he departed with it, he left the appellee and his wife under the understanding that the instrument which they had signed included the 40 acres only and not the other land of the appellee. These facts, we think, constituted

a legal fraud and they show that the appellee and his wife signed the instrument under a mistaken belief that it included only the aforesaid 40 acres, and that, therefore, such damages as the appellee suffered as a direct and proximate result thereof were recoverable by the appellee.

It is further argued by the appellant, however, that the misrepresentation, if any, on the part of appellant's agent was a misrepresentation of law and not of fact and therefore can not be relied upon by the appellee to avoid the instrument. We do not think this is correct. The representation was with reference to the land which was included in the instrument. There was not involved a question as to the interpretation of the instrument, but what was really involved was the question as to what land was included in the instrument. This was a question of fact, and the representation of the appellant's agent to the effect that the land did not include land other than the 40 acres was a misrepresentation of fact and one entitling the appellee to avoid the instrument.

It is next contended by the appellant that the proof is insufficient to support the judgment for damages. Under the weight of authority, if the appellee has suffered damages because of a failure to sell or lease his property and such failure has resulted from a disparagement of the appellee's title caused by the assertion on the part of the appellant of oil rights under the amendment, the appellee, upon proof of such loss of such prospective sale or lease, is entitled to recover damages resulting therefrom.

In Summers Oil and Gas, Permanent Edition, Vol. 4, Section 660, we find the following: "A disparaging statement about particular property has a tendency to depreciate its market value through its effect upon the opinions of other people. But if an owner of property were allowed to recover upon a mere allegation and

proof that a statement made by the defendant had depreciated the market value thereof, the courts would be flooded with actions of this nature.

"A case might be put where a disparaging statement would make it useless to offer the property for sale but the courts have taken a somewhat rigid view of the allegation and proof of damages for the very purpose of discouraging the mass of speculative and frivolous claims that would otherwise be presented to them. Practically all of the cases for disparagement of the title are brought upon the theory that the plaintiff has suffered damages because of a failure to sell or lease the property. Where this is so, the courts, with few exceptions, have held that the plaintiff must allege and prove the prospective sale or lease, set out the name of the purchaser, and allege and prove that the sale and lease was lost because of the disparaging statement."

■■■ Within the principles set forth in the foregoing authority, it appears clear that the appellee was entitled to recover the $5,400.00 for which he sold a lease to Earl R. Wilson. The proof is undisputed that on April 23, 1954, Wilson traded with the appellee and his wife for a lease on 180 acres of the land at $30.00 per acre, and that the appellees executed the lease and delivered it to Wilson and Wilson gave his draft for the purchase price to the appellee in the sum of $5,400.00. At that time there was being drilled in the immediate area a well, which was begun on April 5, 1954. Before the completion of said well as a dry hole, Wilson discovered of record the amendment dated January 12, 1954 which had been procured from the appellee and his wife by the appellant's agent, and by which amendment and the producing well styled "M. O. Berry, et al, No. 1" it appeared that the oil, gas and mineral lease executed by the appellee and his wife on April 15, 1944 was continued in force and effect. He therefore returned the lease which he had obtained from the appellee and his

wife and recovered his draft and cancelled the trans-
action, thus resulting in the loss of the sale of said lease.

It is the appellee's contention, however, that in
addition to the damages sustained in the loss of the sale
of said lease to Wilson in the sum of $5,400.00, he is
entitled to recover as to the balance of the land other
than the aforesaid 40 acres the difference in the market
value of the oil rights before and after the dry hole came
in without proof of a bona fide offer to buy. Without
reference to whether this be or be not a correct mea-
sure of damages under the facts of this case, we are of
the opinion that the damages suffered from this source
under the evidence in this case are so uncertain and in-
definite and so remote as not to be recoverable. The
most that appellee's evidence shows on the question of
market value is that prior to the drilling of the well
which resulted in a dry hole on April 29, 1954, leases in
the area were selling at from $15.00 to $25.00 per acre,
and that leases at this price range continued to sell dur-
ing the succeeding months of June and July, and that
at the time of the trial the "going" price of leases in
the area was $5.00 per acre. There is no proof in the
record that the appellee would have sold a lease at from
$15.00 to $25.00 per acre if he had had the opportunity
to do so, and no proof in the record that he was offered
from $15.00 to $25.00 per acre for such lease even be-
fore the dry hole came in and while the drilling was in
progress. In fact, in the transaction with Wilson, the
appellee refused to accept $25.00 per acre for the lease
which Wilson bought and held out for $30.00 per acre.
Thus, the proof at most shows that while the well which
came in as a dry hole was in the process of being drilled
there was a mere probability or possibility that appel-
lee may have sold a lease of some of his land at $15.00 to
$25.00 per acre. The appellee himself said that he had
no offers during that period of time. These facts render
too remote and speculative damages which the appellee

may have sustained by reason of the alleged disparagement of his title and as a result of depreciation in the market value.

In the case of Turner v. Crane, 115 Miss. 134, 75 So. 945, there was an attachment proceeding which was held to be wrongfully sued out, and it was sought in that case by the defendant to recover damages for the loss of sale of a lot, and damages were awarded in the sum of $80.00. There the Court said: "There was no testimony to sustain the verdict, however, for $80.00 as actual damages in addition to the attorney's fee of $35.00. The only testimony relating to any actual damages was that of the appellee himself that he had had some inquiries to sell the lot and also some conversation with a gentleman about building a house thereon, but that he was unable to do either because of the suing out of the attachment and the levy on this lot. These damages were too remote and speculative upon which to base a recovery. The recovery of the attorney's fee, however, was correct."

In the case of Grantham v. McCaleb, et al, 202 Miss. 167, 30 So. 2d 312, deeds of mineral interests and drafts for the consideration were delivered to a bank for transmittal to the drawee and collection, and the cashier, noticing a typographical inadvertence in one of the deeds, induced the grantor to withdraw the deed and convey the mineral interest to the cashier and another. The drawee in the draft brought suit for tortuous interference with the transaction and sought damages arising out of an enhancement in the market value of the minerals conveyed. In that case the court held that the proof showed no more than a probability that a profitable resale might have been made, the Court saying: "We find no warrant in the record for the allowance of damages arising out of an enhancement in the market value of the minerals conveyed. Mere probability that a profitable resale could have been made is not enough."

In the light of the views hereinbefore expressed, we are of the opinion that the chancellor was correct in awarding damages to the appellee, but that he was in error in fixing the amount of the damages in excess of the sum of $5,400.00, representing the loss of the sale of the lease to Wilson.

We have concluded that the decree of the Court below should be and it is affirmed as to the recovery of damages in the sum of $5,400.00, but reversed as to the damages awarded in excess of $5,400.00, and judgment is rendered here in favor of the appellee for $5,400.00.

Motion to bring in new party overruled and the case on its merits is affirmed in part and reversed in part and judgment rendered here in favor of appellee for $5,400.00.

*McGehee, C.J.*, and *Hall, Lee* and *Kyle, JJ.*, concur.