340 So.2d 434 (1976)
Jessie Lee PARKER
v.
J.H. HOWARTH, D/B/a Circle H. Farms.
No. 48937.
Supreme Court of Mississippi.
December 7, 1976.
Jacobs, Griffith & McIntosh, Charles C. Jacobs, Jr., Cleveland, for appellant.
Campbell & DeLong, Roy D. Campbell, Jr., Greenville, for appellee.
Before PATTERSON, SUGG and WALKER, JJ.
*435 WALKER, Justice, for the Court:
Jessie Lee Parker filed this action in the Circuit Court for the Second Judicial District of Bolivar County, Mississippi, to recover damages resulting from having been run over by a tractor during the course of his employment with J.H. Howarth, the defendant. Howarth pleaded in bar of the action a release signed by Parker and his wife and moved the court to dismiss the suit. The parties agreed to submit the question of the validity of the release to the judge sitting without a jury. After an evidentiary hearing, the judge granted Howarth's motion to dismiss.
Parker argues in effect that the trial court erred in granting Howarth's motion to dismiss since the evidence is clear and convincing that Parker was overreached, deceived and fraudulently induced into signing the release.
The evidence reveals that on April 1, 1972, while working on Howarth's farm, Jessie Parker was run over by the rear wheel of a heavy 4020 diesel tractor, the wheel being approximately five to six feet in diameter. He was treated at the Greenville Hospital by Dr. Lloyd A. Merbitz, who testified by deposition that Parker had suffered severe fractures of the pelvis, had hemorrhaged internally until he was in a state of shock and came near to death, and his blood showed evidence of fat emboli, probably as a result of the fracture. The doctor explained that emboli can lead to unconsciousness or death, and in Parker's case, "It led to considerable confusion [of the mind]." Parker was resuscitated, given blood and medication for pain, and it was necessary to insert a catheter into his bladder. The fractured pelvis was treated by placing Parker in a sling-type affair which consisted of a strap around the pelvis to *436 which was attached five-pound weights which held him in a fixed position for about two weeks for healing purposes. After twenty-nine days of hospitalization, during which time, according to the doctor's testimony, Parker was in pain and received medication for pain, he was released from the hospital on crutches on April 29, 1972, to go home to recuperate. X rays and a subsequent examination by Dr. Merbitz on June 9, 1972, revealed considerable new bone formation around the sacroiliac joint, which was explained as the joint between the pelvis and the spine itself, as well as new bone formation in the general area of the fractures. The doctor also found numbness in Parker's right leg and some elevation of the pelvis on the right side of approximately one-half to three quarters of an inch. He also had some sciatica which is pain involving the sciatic nerve; was experiencing some neurological deficit with dullness to pinprick in the S-1 and S-2 root areas, and in the L-4 root. He also had some dullness to the right side of his penis; had weakness of the dorsiflexors of the big toe, i.e., the muscles which pull the big toe up. The doctor was of the opinion that complaints of pain were justified in Parker's condition and that Parker's pain could be caused by the new bone formation in the area of the nerve roots and that Parker may have some pain for his condition the rest of his life. When the doctor was asked whether Parker had any permanent disability, he said, "I would rate him at 25% permanent impairment of physical function of the body as a whole."
At the time of the accident, Howarth had in force a Farmer's Comprehensive Personal Liability Insurance Policy with United States Fidelity and Guaranty Company which provided, among other things, that the Company was obligated to pay "all reasonable medical expenses incurred within one year from the date of the accident" when an injury to a farm employee arose "out of and in the course of his employment." The parties stipulated that this policy covered such accidents regardless of whether Howarth could be held legally liable.
The alleged release was obtained by Boyd Williams, an adjuster for United States Fidelity & Guaranty Company. Williams is a college graduate and has served in the United States Army. He admittedly was an inexperienced claims adjuster, had received little or no training to be an adjuster, and testified that this was the first or one of the first cases that he handled.
Parker was forty years of age, unable to read or write, except to sign his name, and had a third grade education.
The record shows that Williams visited Parker on several occasions. While Parker was in the hospital, Williams obtained his signature on a medical authorization, allowing him access to medical records and doctor's reports. Moreover, Williams admitted that he knew that Parker had received serious injuries. Williams later visited Parker at home, about a week before obtaining the release, and asked him if he needed any money. Parker told Williams that he did not, although he had borrowed $75.00 from the defendant, Howarth, and his wife's son was "hoping him pay the bills." Williams saw Parker for the last time on May 10, 1972, when he obtained the release in question. His account of that visit was that he knew that Parker was in pain and that he assumed that Parker took drugs for the pain; that Parker was lying in bed during the interview although he seemed talkative and alert. In explaining the purpose of his visit on that day to Parker, Williams testified, "We assumed that this was a case of liability, and in doing so, it was my case and I had to explain to him what he was entitle to." Williams said that he explained to Parker, "I told Jessie that I would give him $800.00, not including his medicals; this $800.00 was for pain and suffering and loss of wages." Williams testified that he explained to Parker that all his medical bills would be taken care of whether he signed the release or not. This was denied by Parker and his wife. It is pertinent to note that none of the medical bills were paid by the insurance company prior to obtaining the release from Parker, although the policy provided that medical expenses resulting *437 from accidents to Howarth's employees would be covered for a period of one year, regardless of legal liability. Williams further testified, "I took out a release and I read the release and I could tell that Jessie could not or did not understand the language, so I broke it down in language that he could understand and I told him exactly what a release meant." (Williams did not testify as to what he told Parker that a release meant.) Parker thereupon signed the release, and at Williams' request Parker's wife also signed the release. Williams testified that he knew that it was not necessary for Parker's wife to sign the release and that she received no consideration for signing it and that he did not explain to her that she was releasing any rights that she might have to damages for loss of consortium. He testified that he simply requested her to sign the release, and she willingly complied without any questions. He testified that Parker seemed "delighted" with the settlement.
Parker testified that when Williams came to his house on the day the release was signed he had been asleep; that his wife woke him up; that he had been taking pills for pain; that he was in pain and that he was "druggy"; that he did not know that his medical bills would be taken care of whether Mr. Howarth was negligent or not; and, that he thought that this was a part payment and that he would get more out of it. He testified that, at the time he signed the release, he needed money "pretty bad" because his utility bills had gone up; his house rent, light bills, water bills, and hospital bills were not paid.
The question presented is whether appellant Parker was overreached or deceived and thereby fraudulently induced to sign the alleged waiver.
It is an elemental principle of law that fraud must be shown by clear and convincing evidence. See, e.g., Aponaug Mfg. Co. v. Collins, 207 Miss. 460, 472-73, 42 So.2d 431, 436 (1949); Alabama & V.R. Co. v. Kropp, 129 Miss. 616, 633, 92 So. 691, 693 (1922).
However, this Court has been liberal in reviewing transactions, where one party might have the advantage over another in experience, knowledge, and wisdom, to determine whether an overreaching, deceit or fraud has been practiced on the disadvantaged person. In the case of Fornea v. Goodyear Yellow Pine Co., 181 Miss. 50, 178 So. 914 (1938), this Court said:
In the light of the fact that people are not prudent, and may at times be unjustifiably imposed upon, this court has been liberal in reviewing transactions where one party might have the advantage over another party in experience, knowledge, and wisdom; but in the absence of fraud, deceit, or fiduciary relations of some kind, the court cannot relieve a person from the consequences of his acts merely because he has not acted prudently or diligently about his contracts or other matters. (181 Miss. at 65-66, 178 So. at 918). (Emphasis added).
We also recognize that although inadequacy of consideration for a release does not per se constitute fraud, it is a factor to be considered in determining whether or not the appellee was deceived or whether the appellee was satisfied in receiving only the amount paid in full and complete settlement of all of his injuries, disability, pain and suffering. Alexander v. Myers, 219 So.2d 160 (Miss. 1969).
Here, it is readily apparent from the evidence that the appellant suffered painful, disabling and permanent injuries and if there was liability, as assumed by adjuster Williams, the sum of $800.00 was grossly and shockingly inadequate.
It is also true that this Court looks with favor on compromise and settlement of doubtful claims and that, "They are encouraged because they promote peace, and when there is no fraud, and the parties meet on equal terms and adjust their differences, the court will not overlook the compromise, but will hold the parties concluded by the settlement." McCorkle v. Hughes, 244 So.2d 386, 388 (Miss. 1971); Kohler v. Oliver, 114 Miss. 46, 49, 74 So. 777 (1917).
*438 However, in the case sub judice, according to the adjuster, Williams, the rights of the parties were not doubtful  he testified that he was assuming that this was a case of liability. Liability might very well prove to be doubtful upon trial on the merits of the case, but that was not the position taken by Williams, who was the agent of Howarth at the time he obtained the release. This admission by Williams distinguishes this case from such cases as Pearson v. Weaver, 252 Miss. 724, 173 So.2d 666 (1965), in which the adjuster told the claimant that he felt there was no liability but offered a nominal sum simply "to buy peace for his company." Id. at 731, 173 So.2d at 669.
Moreover, it could hardly be argued seriously that these parties met on equal terms to adjust their differences.
We have carefully reviewed this record and are of the opinion that under the circumstances presented  where the injured party was paid a grossly inadequate consideration, was unable to read or write, had serious, painful, disabling permanent injuries, had not been released by his doctor and did not know the extent of his injuries, was forced to borrow money from the defendant to pay his living expenses, was in pain when the alleged release was signed, was taking "pain pills," and was so uneducated that he admittedly could not understand the terms of the release when it was read to him; and, where the release was obtained by a college educated claims adjuster (of little experience) who had access to the hospital and medical records of the appellant, and whose employer, United States Fidelity & Guaranty Company, was obligated to pay the hospital and medical expenses incurred by appellant for one year regardless of Howarth's liability but had failed to pay or make any effort to pay these bills prior to obtaining the alleged release, and who admittedly had appellant's wife [who is not a party to the suit] to sign the release without any consideration to her whatsoever or explanation that she was signing her rights away  these circumstances evince such an overreaching of appellant as to amount to constructive fraud which vitiates the alleged release.
We are of the opinion that the lower court erroneously sustained the appellee's motion to dismiss the cause and that same should have been heard on its merits.
We have carefully considered appellee's arguments for upholding the release and find them to be without merit. The judgment of the lower court is reversed and this cause is remanded for a trial on the merits.
REVERSED AND REMANDED.
GILLESPIE, C.J., PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, SUGG, BROOM and LEE, JJ., concur.