427 So.2d 118 (1983)
Larry L. JOHNSON
v.
Otho BREWER and Ossie Brewer.
No. 53602.
Supreme Court of Mississippi.
February 16, 1983.
Brunini, Grantham, Grower & Hewes, Christopher A. Shapley, Jackson, for appellant.
Fred L. Cooper, Richard D. Foxworth, Columbia, for appellees.
Before BROOM, P.J., and BOWLING and HAWKINS, JJ.
*119 BROOM, Presiding Justice, for the Court:
Fraudulent procurement of an oil, gas and mineral lease is the chief aspect of this case, filed by Otho Brewer and wife, Ossie Brewer (complainants/appellees) against Larry L. Johnson (defendant/appellant), in the Chancery Court of Marion County, the Honorable Sebe Dale, Jr., chancellor. The chancellor's decree set aside the lease on the ground of fraud. We affirm.
Among other things, appellant Johnson asserts here that the trial court erred in (1) holding that the consideration paid for the lease raised a presumption of fraud; (2) its finding of "grossly inadequate consideration" was without adequate evidentiary support and was manifestly wrong; and (3) the decree was based upon erroneous legal principles.
Appellee, Otho Brewer, owns record title to a tract of land in the Expose community of Marion County. He is nearly 80 years old, has a sixth grade education, and has limited reading ability. On July 1, 1972, Brewer executed an oil, gas and mineral lease on his land in favor of one J.L. McCollum. This lease had a 10-year primary term; Brewer retained a 1/8th royalty. At that time, Brewer was married to Annie Brewer, who obviously signed the instrument but signed as a witness instead of as a lessor. The land in question at that time was the Brewer's homestead.[1]
Subsequent to Otho Brewer's signing the above mentioned lease, gas was discovered in the area of the subject land and the land *120 was designated as part of a unit by the Oil and Gas Board. In 1980, after the death of Otho Brewer's first wife Annie, a landman, Kevin Jeffreys, was examining land records in the Marion County Courthouse. Jeffreys was approximately 25 years old, a Millsaps graduate, and had several years experience as a landman for various oil and gas companies. While doing this work in the courthouse, Jeffreys came across the lease from Otho Brewer to L.J. McCollum and noticed what possibly constituted a flaw (Annie's signature as a witness) in its execution. He notified his employer, Larry Johnson (appellant herein), of the existence of this potentially defective lease. Johnson sought legal advice concerning the lease and received conflicting legal opinions as to its validity. Nonetheless, he directed Jeffreys to attempt to obtain a second or "cover" lease on the property in question.
Shortly after the execution of the McCollum lease in 1972, Annie Brewer died, and in 1975 Otho Brewer married Ossie Brewer. Kevin Jeffreys went to Expose and obtained a second lease (the one in controversy now) from Otho and Ossie Brewer on the property in question, giving them a draft for approximately $1500 ($50 an acre) bonus for signing the lease. Interestingly, the draft was never presented for payment though no issue is made of this fact.[2]
The Brewers' position is that Jeffreys fraudulently obtained the "second lease" from them purporting it to be a correction of the first lease which Otho Brewer's wife, Annie, had erroneously signed as a witness.
Otho Brewer testified that, according to his understanding gained from Jeffreys, Annie's signature in the wrong place required the new instrument in order to insure that the signatures on the lease were in the proper location. Ossie Brewer and her daughter, Joyce Hartwell, corroborated this testimony. Kevin Jeffreys, on the other hand, testified that he completely explained the entire situation with regard to the McCollum lease and indicated that he merely wanted another lease "just in case" the first lease should prove to be invalid.
Next day, as Otho Brewer was on his way to the bank to present the draft Kevin Jeffreys had given him, he encountered one Taylor and informed him of the events that had transpired. Taylor informed Brewer that Brewer had not received adequate consideration for a lease, and subsequently Brewer executed to Mr. Taylor and a Mr. Wilkinson another lease on the same property for a 1/4th royalty and a $30,000 bonus, such bonus being payable $1500 immediately and $28,500 upon the cancellation of the first two leases.
Pursuant to appellant Johnson's motion, the chancellor included fact-findings and law conclusions in his opinion disposing of the case. From this decision, in which the chancellor found that the lease executed in favor of Johnson was obtained through the fraudulent misrepresentation by Kevin Jeffreys, appellant Johnson brings this appeal.
Johnson's assignments of error are closely interrelated and therefore will be discussed in conjunction with each other. Our decision will discuss the issues presented by the parties, first by an examination of the testimony in order to determine whether the chancellor's decision to set aside Brewer's lease to Johnson was supported by adequate evidence. The question of whether such evidence rises to the standard of "clear and convincing" evidence required for a finding of fraud will then be examined in light of the first assignment of error regarding the chancellor's conclusion of law that shockingly inadequate consideration raises a presumption of fraud.
In determining whether there was adequate evidence to support the chancellor's decision to set aside the Johnson lease on the basis of fraud, we are mindful of the elements which must be proven in any action seeking to establish fraud. Crawford v. Smith Brothers Lumber Co., Inc., 274 So.2d 675 (Miss. 1973), set forth the requisite elements of proof in an action grounded in fraud:

*121 [T]he elements of actionable fraud consist of: (1) a representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury. ([Gardner v. State] 235 Miss. [119] at 130, 108 So.2d [592] at 594.)
Id., at 678.
First element we must look for here is a representation, or the concealment of a fact by one under a duty to reveal such fact. In the instant case, the alleged representation upon which this action is based was the representation from Jeffreys to Brewer that the document Jeffreys sought Brewer to sign was merely for the purposes of correcting Brewer's original lease to L.J. McCollum, executed in 1972. Otho Brewer testified at trial that Jeffreys told him he needed to sign the paper but did not tell him that it was a separate lease. Brewer stated that Jeffreys told him that what he was signing was the same lease. He indicated that Jeffreys told him only that he was working for his "boss", and that as a result of Jeffreys' representations, Brewer thought that he was merely correcting his lease already in force. Brewer's testimony was as follows:
Q. Did you read that instrument?
A. No, sir.
Q. Did he read it to you?
A. No, sir.
Q. Did you look at both sides of it?
A. No, sir. He never showed me, but just told me where to put my name right here.
Q. Did you have anything to do with preparing that instrument that you signed?
A. No, sir. He never asked me to.
Q. What was your intentions in signing that document? What were you signing it for?
A. Well, I was signing it because he told me it was the same thing that Mr. McCollum had and it would be just like it, the same lease. I told him, I says, now I don't want to sign it, I said because I done signed it to him. He said that's all right, says it won't be anything. He says sign your name here. That's all it needed just to have that and get your other wife to sign under it.
On cross-examination, Brewer once again reiterated that Jeffreys had told him he was merely re-signing the same lease.
Otho Brewer's second wife, Ossie, who also signed the lease, corroborated her husband's testimony:
Q. Did you have any discussions with this gentleman at that time? Did he say anything to you?
A. I believe he said something concerning signing a paper.
Q. Did he tell you what type of paper it was?
A. He said it was the paper that they had already had and his wife, other wife, name was there and her name was on the witness side and therefore I would have to sign where her name was supposed to have been under my husbands name.
Also present at the signing was Joyce Hartwell, Mrs. Brewer's daughter by a previous marriage. Joyce Hartwell's testimony corroborated that of her mother and stepfather.
Thus the evidence (accepted by the chancellor) establishes that there was indeed a representation made that the document being signed was merely in correction of an already existing lease. Nonetheless, another question remains with respect to this representation. Traditionally, a misrepresentation upon which an action for fraud is predicated must be a representation of fact and not a representation of the law. Harrison v. Vermillion, 213 Miss. 334, 56 So.2d 811 (1952); Corbin, Contracts, § 618 (one vol. ed. 1952). Thus it becomes necessary to determine whether the representation *122 as to the nature of the document being signed was a representation of fact or a representation of law. If it is indeed determined to be a misrepresentation of law, the question remains as to whether the facts surrounding the misrepresentation are such as to bring it within an exception to the general rule.
Pennsylvania Mutual Life Insurance Company v. Nunnery, 176 Miss. 197, 167 So. 416 (1936), dealt with a misrepresentation made by the insurance company's representative to the beneficiary of a policy, such misrepresentation being to the effect that the legal effect of the policies was null and void. In holding that such a statement did constitute an actionable misrepresentation, this Court stated:
The appellant says, further, that the misrepresentation was one of law and not of fact. The misrepresentation was akin to, and may be, a misrepresentation of fact; but we will assume, for the purpose of argument, that it was a misrepresentation of law. A misrepresentation of domestic law, which is but a form of the expression of an opinion, does not ordinarily constitute a predicate for a fraud. For it to do so, it must be accompanied by some inequitable conduct by the person making it, which induced another to rely and act thereon. 2 Pom.Ed., secs. 842-847. One instance of such conduct is where the maker of misrepresentations has or professes to have knowledge of the law superior to that of a person to whom the representation is made, and thereby induces such person to rely and act on the misrepresentation.
Id., at 210, 167 So. at 418. (emphasis added).
In the case cited by the appellant for the proposition that a misrepresentation of law does not constitute an actionable misrepresentation, Harrison v. Vermillion, supra, we noted an exception to the general rule that fraud could not be predicated upon a misrepresentation of law:
There is no intimation that complainants had, or pretended to have, legal knowledge superior to that possessed by complainants. Fraud could not be predicated upon that situation. Penn. Mutual Life Insurance Company v. Nunnery, 176 Miss. 197, 167 So. 416. The demurrer should have been sustained.
Id., at 339, 56 So.2d at 814. See also, White v. Union Producing Co., 140 F.2d 176 (5th Cir., 1944), (applying Mississippi law).
When Jeffreys represented to the Brewers that the document he wished for them to sign was merely a correction to the original lease that they had executed in favor of McCollum, he was not in actuality misrepresenting his view as to a possible legal interpretation of the document, but rather was misrepresenting what he himself intended the document to be. There is a distinction between the basic inherent nature of an instrument as intended by the party seeking to have such an instrument executed, and the situation which might arise, for example, wherein one party promulgates a misrepresentation to another party to the effect that Mississippi law does not recognize the doctrine of comparative negligence. A misrepresentation of the nature promulgated by Jeffreys as to the nature and intent of an instrument is in actuality a misrepresentation of fact. See Hunt Oil Company v. Berry, 227 Miss. 234, 86 So.2d 7 (1956).
Secondly, was the representation false? In the instant case, there is no dispute that if Jeffreys did indeed represent the document in question to be a correction to the original lease, such representation was false.
Thirdly, was the misrepresentation material? We conclude that the difference between a correction of a pre-existing lease and the execution of an entirely new and different lease after a producing gas well has been drilled on the property sufficiently establishes the materiality of the misrepresentation.
Fourthly, did Jeffreys, the misrepresenting party, have knowledge that his representation was false. In the instant case, there is no question but that Jeffreys knew that the document he had Mr. Brewer sign was in actuality an oil, gas and mineral *123 lease separate and entirely disconnected to the McCollum lease. If he did indeed represent the document in any other shape, form or fashion, he did so with knowledge that such representation was false.
Fifth, did Jeffreys make the misrepresentation with the intent that it be relied upon? Jeffreys testified that he went down to Expose for the purpose of obtaining a lease from Brewer. Any representations made to Brewer concerning the nature of the instrument were obviously made with the intent that they induce Brewer to sign the lease.
Sixth, was Brewer ignorant of the falsity of the representation? Mr. Brewer testified that he did not read the document. If he did not read the document, it follows that he was ignorant of the fact that Jeffreys' representation was false.
Seventh, did Brewer rely upon the misrepresentation? Mr. Brewer testified that he did not read the document because Jeffreys told him what it was and he relied upon Jeffreys to tell him the truth.
Eighth element in an action for fraud is that the complaining party have had the right to rely upon the representations. The question of whether the executor of an instrument has the right to rely upon the representations of the party seeking to have him so execute the instrument was dealt with by this Court in Hunt Oil Company v. Berry, supra. In that case, we noted that when the oil company's agent, who was seeking to induce Berry to sign an oil, gas and mineral lease, undertook the task of explaining to Berry (at Berry's request) the nature of the instrument, that Berry did indeed have a right to rely upon that agent's representations. In so holding, this Court adopted the rule stated in 12 Am.Jur. Contracts § 145:
We think that under the circumstances the appellee had a right to rely upon the appellant's agent and that he did rely thereon.
In 12 Am.Jur., Contracts, Section 145, the rule is stated as follows: "The rule that a person who fails to have a contract read to him before signing it can have no redress does not apply in the case of fraud or false representations by which he is lulled into security or thrown off his guard and deceived. If a person is ignorant of the contents of a written instrument and signs it under a mistaken belief, induced by misrepresentation, that it is an instrument of a different character, without negligence on his part, the agreement is void."
227 Miss. at 245, 86 So.2d at 11.
This rule of Mississippi law has likewise been recognized in the Fifth Circuit Court of Appeals. White v. Union Producing Company, 140 F.2d 176 (5th Cir., 1944), (applying Mississippi law), the Fifth Circuit considered the validity of a co-leasor's agreement which was allegedly procured by fraud. The appellant in White did not read the lease but was told that it was a certificate of heirship. The Court held that the appellant had the right to rely upon the representations made by the lessee's agent. There the court noted the distinction between a party who improvidently executes a contract without reading it, and a party who relies upon fraudulent misrepresentations. The Fifth Circuit Court stated:
There is a distinction between the case of an individual who imprudently executes a contract without reading it, and of one who signs a contract in reliance upon fraudulent misrepresentations as to its contents.
Id., at 178.[3]
Likewise there is a distinction in the situation where a person improvidently or recklessly neglects to read a document prior to signing it, and the fact situation involved in the instant case, where such failure to read the document was induced by misrepresentations of Jeffreys.
*124 Final (ninth) element in an actionable fraud is the existence of damages resulting from the misrepresentation and the reliance thereon. It seems fair to say that the question of damages is effectively disposed of by an examination of the provisions of the second lease calling for an immediate $1,500 bonus, and the third lease signed by the Brewers which contains provisions for a $30,000 bonus and a 1/4th royalty.
Obviously there was evidence put forth at trial on each element required to be established in an action based upon fraud. Nonetheless the question remains as to whether this proof rises to the level of "clear and convincing" proof which is required in order to establish fraud. Clement v. R.L. Burns Corp., 373 So.2d 790 (Miss. 1979); Hamilton v. McGill, 352 So.2d 825 (Miss. 1977); Crawford v. Smith Brothers Lumber Co., Inc., supra; McMahon v. McMahon, 247 Miss. 822, 157 So.2d 494 (1963).
With this question in mind, an examination of the appellant's first assignment of error is required.
In his conclusions of law, the chancellor made the following statement:
Based upon the foregoing stated findings of fact, supported by clear and convincing proof as the Court views them, the Court concludes as a matter of law the following:
1. Under the authority of Section 589, Griffith's Chancery Practice, there is the presumption of fraud because of the shockingly inadequate consideration, which presumption is not overcome by the Defendant's proof, and therefore the lease in question is void.
Section 589 of Griffith's Chancery Practice, cited by the chancellor, reads as follows:
[F]raud arises by presumption from certain states of facts, when shown to exist, in cases: (1) of confidential relations; (2) where a trustee deals with himself; (3) where the consideration paid is shockingly inadequate; (4) where a person of weak mind is apparently imposed upon; (5) in unjust voluntary conveyances as against creditors, and (6) others within like principles.
Griffith, Chancery Practice, § 589 (2nd ed., 1950), at pp. 622-23.
We think the quoted language of the chancellor is less than precisely accurate in his characterization of shockingly inadequate consideration as raising a presumption of fraud. Nevertheless, be it said to his credit that he based his statement upon credible support in citing Judge Griffith's excellent work, Chancery Practice, which we all generally accept as a "lawyer's bible". In spite of this statement, this Court has clearly and unequivocally taken the position, in a long line of cases, that there is always a presumption against fraud and conversely fraud is never presumed.[4]Clement v. R.L. Burns Corp., supra; Hamilton v. McGill, supra; Crawford v. Smith Brothers Lumber Co., Inc., supra; McMann v. McMann, supra; Osborn v. Thomas, 221 Miss. 682, 74 So.2d 757 (1954). The role which a finding of shockingly inadequate consideration has played in Mississippi jurisprudence with respect to fraud has been somewhat less than clear. Nonetheless, we recently addressed that very question in Parker v. Howarth, 340 So.2d 434 (Miss. 1976). Two very pertinent pronouncements are set forth in Parker. First, this Court has been liberal in reviewing transactions wherein one party has taken advantage of another party's lesser bargaining status. Here Jeffreys did just that and withheld the material fact that he was seeking a new lease rather than to correct the McCollum lease. Secondly, Parker states that inadequacy of consideration does not constitute fraud per se but rather is a factor to be considered in determining whether there has been a perpetration of a fraud. The following applicable language is excerpted from Parker:

*125 However, this Court has been liberal in reviewing transactions, where one party might have the advantage over another in experience, knowledge, and wisdom, to determine whether an overreaching, deceit or fraud has been practiced on the disadvantaged person. In the case of Fornea v. Goodyear Yellow Pine Co., 181 Miss. 50, 178 So. 914 (1938), this Court said:
In the light of the fact that people are not prudent, and may at times be unjustifiably imposed upon, this court has been liberal in reviewing transactions where one party might have the advantage over another party in experience, knowledge, and wisdom; but in the absence of fraud, deceit, or fiduciary relations of some kind, the court cannot relieve a person from the consequences of his acts merely because he has not acted prudently or diligently about his contracts or other matters. (181 Miss. at 65, 66, 178 So. at 918). (Emphasis added).
We also recognize that although inadequacy of consideration for a release does not per se constitute fraud, it is a factor to be considered in determining whether or not the appellee was deceived or whether the appellee was satisfied in receiving only the amount paid in full and complete settlement of all of his injuries, disability, pain and suffering. Alexander v. Myers, 219 So.2d 160 (Miss. 1969).
Id., at 437.
Lampley v. Pertuit, 199 So.2d 452 (Miss. 1967), described the role which a finding of shockingly inadequate consideration played in an action for fraud. Citing Bethea v. Mullins, 226 Miss. 795, 804, 85 So.2d 452, 456 (1956), we reaffirmed the rule stated in 16 Am.Jur. Deeds, section 33:
In the case of Bethea v. Mullins, 226 Miss. 795, 804, 85 So.2d 452, 456 (1956), this Court approved and adopted a rule stated in 16 Am.Jur. Deeds section 33:
"* * * (I)f the inadequacy of consideration is so glaring as to stamp the transaction with fraud and to shock the common sense of honesty, a court of equity will intervene. If the consideration is grossly inadequate, equity in any case will lay hold of slight circumstances of oppression, fraud, or duress in order to rescind the conveyance."
199 So.2d at 454.
Likewise, Carter v. Dabbs, 196 Miss. 692, 18 So.2d 747 (1944), and Pipes v. Webb, 236 Miss. 612, 111 So.2d 641 (1959), held that the inadequacy of consideration was a proper area for concern. Carter indicated that if the consideration was grossly inadequate, such a factor might justify setting aside a deed.
One of the earliest cases on the issue of inadequacy of consideration as establishing fraud is the case of Foster v. Pugh, 20 Miss. (12 S & M) 416 (1849). Foster states that inadequacy of consideration was not enough, in and of itself, to establish fraud, but when combined with other circumstances constituted the "badge of fraud".
Grossly inadequate consideration is not fraud per se, but is germane to the question of the damages incurred by the deceived party. Shockingly inadequate consideration is to fraud as a bad smell is to a putrefying carcass. Just because there is a bad smell in the air doesn't necessarily mean that there is a carcass nearby, but if the smell is bad enough it is strongly suggestive. Similarly speaking, if the consideration in a transaction is grossly inadequate, such inadequacy constitutes a powerful glue which binds together other factors, other pieces of the puzzle which constitutes an overall fraudulent scheme.
If grossly inadequate consideration is the badge of fraud, and not the act, the question arises as to whether in the instant case the consideration offered by Jeffreys for the execution of the second lease was indeed inadequate. In answering such a question, relevant considerations involve how one may determine what constitutes adequate consideration for an unliquidated claim. Here we must consider the nature of the proof offered by the Brewers as to whether the consideration was indeed inadequate.
*126 Larry Johnson testified to the effect that if the McCollum lease were valid, the lease that his agent, Jeffreys, had obtained from the Brewers was worthless. On the other hand, if the first lease were void, he testified that such a lease would have been worth in the neighborhood of $1,000 an acre. Johnson maintained that the uncertainty of the nature of the claim resulted in the lease only being worth approximately what he offered for it.
It is important to note that the land in question was part of a producing gas unit. Ordinarily when one purchases an oil and gas lease, the purchaser is faced with the risk of a dry hole. In such a case, a lease, even though obtained at as high a price as $1,000 an acre, is worth nothing. In the instant case, such risk was not present. Johnson testified that in his personal opinion there was a 50-50 chance that the McCollum lease would be declared void. If Johnson's chances were 50-50 of having the first lease declared void, they were still considerably better than the risks he would run in drilling an exploratory well. As has been previously noted, there was a producing gas well associated with the Brewers' mineral interest.
The chancellor heard testimony of the value of similarly situated unleased land, and testimony as to the going price of royalty in the area. He likewise admitted into evidence the first lease itself for whatever evaluation he cared to put on it. We are unwilling to hold that the contingent nature of the object of the transaction rendered this evidence totally incompetent.
Based upon all of the evidence before him, it cannot logically be said that the chancellor was unjustified in his finding of fact that the consideration offered by Johnson was inadequate. According to Johnson's own evaluation of his chances, he had a 50-50 chance of the first lease being held invalid. Thus, under his own evaluation of the worth of unleased land in the area as $1,000 per acre, one is led to speculate as to why he didn't offer half that amount. Likewise he could have offered what the property was worth and made the payment of such an amount contingent upon a declaration that the first lease (McCollum) was void. Had Jeffreys been fair, he would have explained that if the McCollum lease were void, then he would pay Brewer a fair price based upon the fact that a producing well was on Brewer's land. Careful study of the record in its entirety leaves us unable to rule that the chancellor was not justified in finding that the consideration offered by Jeffreys and Johnson to a 79-year-old man with a sixth grade education who demonstrated a minimal degree of reading ability was grossly inadequate.
Having made the foregoing analysis, we return to appellant Johnson's second assignment of error, i.e., the assertion that the Brewers did not establish the elements of fraud by clear and convincing evidence, which of course is the appropriate standard to be applied in all cases alleging fraud. It is important to note that the mere fact that evidence presented by both parties is in direct conflict does not automatically mean that clear and convincing evidence is lacking. This Court has held on repeated occasions that the existence of such conflicting and contradictory evidence makes a case that is properly for the trier of fact to resolve. See Anderson Dunham, Inc. v. Aiken, 241 Miss. 756, 133 So.2d 527 (1961); Hunt v. Sherrill, 195 Miss. 688, 15 So.2d 426 (1943); Truckers Exchange Bank v. Conroy, 190 Miss. 242, 199 So. 301 (1941). We are not prone to overturn such a finding of fact in the absence of manifest error, but upon occasion when such error is clearly shown reversal may be appropriate. Taft v. Taft, 252 Miss. 204, 172 So.2d 403 (1965). The wisdom of such a position becomes readily apparent in the fact situation presented by the instant case, where the questions of fact rest largely upon the credibility of the testifying witnesses. Being able to observe the demeanor of the witnesses, to scrutinize their reactions and responses to the questions propounded by counsel, puts the fact trier in a uniquely superior position to glean the truth from testimony. The learned chancellor, in a case such as the one before this Court, is in better position to evaluate *127 "who is telling the truth" than is this Court faced with the cold stark language of the trial record.
As indicated above, the chancellor's conclusion of law that fraud was presumed may be subject to criticism in view of our cases holding that fraud is never presumed. Nonetheless, as we have stated on numerous occasions, if the result reached by a chancellor's decision is correct, we will not reverse that chancellor for misdirections to himself. Daniels v. Bush, 211 Miss. 1, 50 So.2d 563 (1951); Bowlin v. Dye, 214 Miss. 710, 59 So.2d 327, suggestion of error overruled, 214 Miss. 710, 59 So.2d 843 (1952).
We cannot agree with the argument that the chancellor was manifestly wrong, and indeed his finding of shockingly inadequate consideration does lend strong support to a finding of fraud. Shockingly inadequate consideration is corroborative of the Brewers' other testimony. The testimony and the factual situation set forth presented a very close question of fact and law to the lower court. Testimony given by both parties is in direct opposition, and there was evidence presented of prior inconsistent statements in depositions and at various points at trial which could be interpreted as conflicting. However, passing upon witnesses' credibility is the function of the lower court.
We are unable to say that the chancellor's decision was manifestly incorrect, or that reversible error has been established. Thus affirmance must be our order.
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
NOTES
[1] We specifically do not reach the question of the validity of this first lease, although urged to do so. Even were we inclined to do so, we could not since McCollum is not a party to the present action.
[2] Though not controlling or pertinent upon the pleadings in the instant case, see Figg v. Cupit, 401 So.2d 722 (Miss. 1981), where we dealt with the effect of a contract supported by consideration represented by a bank draft.
[3] It should be noted that in White the misrepresentation was considered actionable, even though the nature of the instrument constituted the crux of the misrepresentation. The Fifth Circuit apparently did not even deem it necessary to discuss the distinction between misrepresentation of fact and of law.
[4] One notable exception exists to this presumption when the facts presented show the existence of a fiduciary or confidential relationship. See Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926); Webb v. Webb, 99 Miss. 234, 54 So. 840 (1911).